**UNITED STATES, Appellee,**

v.

**Paul E. GRIER, Private First Class, U.S. Army, Appellant.**

No. 99–0547.
Crim.App. No. 9700651.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 19, 2000.

Decided May 12, 2000.

CRAWFORD, C.J., delivered the opinion of the Court, in which SULLIVAN, GIERKE, and EFFRON, JJ., and EVERETT, S.J., joined.

For Appellant: *Captain Katherine A. Lehmann* (argued); *Colonel Adele H. Odegard, Major Scott R. Morris* (on brief); *Colonel John T. Phelps, II* and *Major Leslie A. Nepper.*

For Appellee: *Captain Troy A. Smith* (argued); *Colonel Russell S. Estey* and *Lieutenant Colonel Eugene R. Milhizer* (on brief); *Captain Kelly D. Haywood.*

Chief Judge CRAWFORD delivered the opinion of the Court.

In March 1997, a general court-martial composed of officer members convicted appellant, Private First Class (PFC) Paul Grier, contrary to his pleas, of one specification

each of rape, consensual sodomy as the lesser-included offense of forcible sodomy, and adultery, in violation of Articles 120, 125, and 134, Uniform Code of Military Justice, 10 USC §§ 920, 925, and 934, respectively. Appellant was acquitted of assault consummated by a battery, in violation of Article 128, UCMJ, 10 USC § 928. He was sentenced to a dishonorable discharge, 4 years' confinement, total forfeitures, and reduction to the grade of Private E-1. The convening authority approved the sentence. By action of the Deputy Assistant Secretary of the Army (Army Review Boards), dated February 12, 1998, the unexecuted portion of the sentence to confinement was remitted and the dishonorable discharge was upgraded to a general discharge. The Court of Criminal Appeals affirmed the findings of guilty and the adjudged sentence on December 11, 1998, in an unpublished opinion.

We granted review of the following issues:

I. WHETHER THE MILITARY JUDGE ERRED AS A MATTER OF LAW BY FAILING TO PROPERLY DEFINE THE LAW OF "CONSENT" AND "INTOXICATION" FOR THE MEMBERS, WHERE THE MILITARY JUDGE ALSO FAILED TO INFORM THE MEMBERS THAT THE LEGAL CONCLUSIONS USED BY THE CID [Criminal Investigation Command] AGENT DURING APPELLANT'S INTERROGATION WERE ERRONEOUS.

II. WHETHER THE MILITARY JUDGE, AND SUBSEQUENTLY THE ARMY COURT, ABUSED ITS DISCRETION IN FINDING THAT THE EVIDENCE WAS LEGALLY SUFFICIENT TO SUPPORT THE FINDING THAT APPELLANT COMMITTED RAPE, IN LIGHT OF THE JUDGE'S INCORRECT INSTRUCTIONS ON THE LAW OF "CONSENT" AND "INTOXICATION."

## FACTS

Appellant was assigned to Fort Campbell, Kentucky, with another PFC named Lewis.

In spring and summer of 1996, appellant became friends with PFC Lewis' wife, Cherise. The Lewises were experiencing marital difficulties and Ms. Lewis testified she went to appellant with her concerns and for friendship. The two spent a fair amount of time together, to include driving to Nashville, Tennessee, ostensibly with Ms. Lewis' husband's knowledge, for a weekend of dancing; and going to the mall, etc. Here agreement on the facts ends and the two stories diverge as to the depths of this relationship.

Appellant contends that the relationship between the two included oral sex in a car. He also asserts that he and Ms. Lewis had sexual intercourse about half a dozen times, including the night of a party in appellant's room. Another witness testified (by stipulation) to watching appellant and Ms. Lewis kissing at Ms. Lewis' apartment, an incident that appellant admitted. There was also a purported "love note" passed from Ms. Lewis to appellant through her husband. This note contained references to what appellant described as a code. The numbers 1 4 3 were written at the bottom. Appellant asserted at trial that this was their code for "I love you" (1 letter for "I," 4 letters for "love," and 3 letters for "you."). The note also asked for him to remember a song, which appellant explained was the song that was on the radio when the two had oral sex.

Ms. Lewis denied that the relationship was anything but platonic. She does not remember the corroborated kiss at her apartment, does not remember having oral sex with appellant, and denies having intercourse with appellant on previous occasions. She admitted writing the letter to appellant,[1] but did not comment on the "secret" love codes contained in the letter.

All of these disputed incidents in the relationship of appellant and Ms. Lewis lead to the night of June 6, 1996. On this evening, the undisputed facts are as follows: On the 6th of June, Ms. Lewis was packing her belongings to leave the marital abode. While she was packing, appellant and his friend,

---

1. After appellant had made jokes to PFC Lewis about wanting to have sex with Ms. Lewis if the marriage ever broke up, PFC Lewis told appellant's NCOs and they told appellant "to stay away from" the Lewis house. This "love note" refers to appellant's being told to stay away.

PFC Gosney, came over to the house and asked her to come to dinner with them and some female friends. The three arrived at the restaurant at about 8 or 8:30 p.m. They stayed at the restaurant for about 2½ hours and drank alcohol. They went to a dance club after this and stayed drinking alcohol and dancing for about one hour.

It is disputed how much alcohol Ms. Lewis had to drink that evening. Ms. Lewis states she had 3 beers and 3 rum and cokes, but that she gets drunk after only 2 beers. PFC Lewis, Ms. Lewis' husband, testified that she told him she had had 4 beers and 2 rum and cokes, and that, in his experience with Ms. Lewis, this is enough to get her drunk, but not enough to make her stumble around. Appellant contends Ms. Lewis had 1–2 beers and 3 mixed drinks. He also testified that he had been with Ms. Lewis on another occasion where she drank a 6–pack of beer and seemed fine.

Also disputed is Ms. Lewis' condition upon leaving the dance club. Ms. Lewis testified that she was so drunk she could not keep her eyes open. The last thing she testified to remembering was seeing her apartment building, stumbling, and hearing appellant and PFC Gosney say they would help her inside. A woman who was at the restaurant and dance club with Ms. Lewis and appellant testified by stipulation that she "didn't notice" Ms. Lewis having any problems walking or doing anything else at the dance club that would make her seem drunk. PFC Lewis testified that when Ms. Lewis later told him about the incident, she claimed "that she didn't think" she had enough to drink to be intoxicated. Appellant testified that Ms. Lewis needed no help getting around, was not stumbling, opened the apartment door herself, and sat in the living room chatting with appellant and PFC Gosney for a short while. Appellant also testified that Ms. Lewis got up and went to the bathroom, claiming when she returned that she had gone to vomit.

Ms. Lewis has no version of the events of that night after seeing the apartment building. She testified that she woke up the next morning naked, with male emissions on her body, leading her to believe that someone had had sex with her that evening. Appellant has a more detailed version of events. He testified that Ms. Lewis laid down on her bed and that he laid next to her and she began kissing him. Appellant then testified that Ms. Lewis began to initiate oral sex on him. At this point, PFC Gosney walked into the room. Appellant testified that he asked Ms. Lewis if she wanted to have sex with both men and she replied "yeah."[2] Both men had sex with Ms. Lewis twice. Appellant testified that Ms. Lewis seemed actively engaged in the activity, rubbing PFC Gosney's head and back and saying to appellant, "F* * * me harder." After having intercourse, the three got dressed and drank some soda in the kitchen. Appellant testified that Ms. Lewis became upset because she "said that she didn't think that PFC Gosney and I would talk to her after this." Appellant assured her that he would speak to her again and they embraced and kissed. Then he left with PFC Gosney.

The bulk of the Prosecution's evidence against appellant was impeachment evidence obtained from his sworn statement to CID investigators about the incident. Ms. Lewis reported this rape on August 2, 1996, after telling her husband about the incident. Appellant was questioned by CID on the 5th of August 1996. Appellant waived his rights and gave a statement to the investigators. The statement included these exchanges between CID Agent Wagner and appellant:

Q. Was she intoxicated?

A. She kept saying that she was intoxicated on the way back to her house. I believe she was intoxicated.

* * *

Q. Did Mrs. LEWIS ever give verbal consent to having sex with Brad [PFC Gosney]?

A. No.

---

**2.** There is a discrepancy here because appellant's sworn statement says that Ms. Lewis did not    reply.

Q. Do you think she wanted to have sex with Brad?

A. No, she said she loved me.

\* \* \*

Q. Do you think you took advantage of Mrs. LEWIS?

A. Yes, I went along with the situation.

Q. In your honest opinion, do you think Mrs. LEWIS was in a state of mind where she could give consent to having intercourse?

A. No.

\* \* \*

Q. Why do you think Mrs. LEWIS did not give consent to intercourse?

A. She was not in her right state of mind.

\* \* \*

Q. What is your definition of Rape?

A. Forcing someone to have sex when they do not want to or have intercourse with someone who is not in their right state of mind.

Q. What do you mean not in their right state of mind?

A. Not fully aware of the situation.

Q. By your definition, what do you call the events on 7 Jun 96?

A: It is quite possibly a rape case.

\* \* \*

Q. Do you have anything to add to this statement?

A. At the time this happened, I did not know if a woman is not capable of giving consent, it is rape. Now I know it is rape.

(This statement was not offered into evidence at trial, but was used for impeachment purposes.)

Regarding the legal words that appellant used in this confession, namely consent and intoxication, Agent Wagner testified as to how the words were explained to appellant before he used them. With regard to consent, Agent Wagner testified that he is "sure" he told appellant that consent is a "verbal affirmation." He did not discuss with appellant an indication of consent in any way other than verbally saying "yes." Regarding intoxication, Agent Wagner testified that he told appellant if a person is intoxicated, they are unable to consent. He did not explain to appellant that there are different levels of intoxication and not all of these levels mean a victim is unable to consent to sexual intercourse.

The Judge gave the following instructions after all the evidence was presented:

When a victim is incapable of consenting because she is asleep or unconscious or intoxicated to the extent that she lacks the mental capacity to consent, then no greater force is required than that necessary to achieve penetration.

\* \* \*

If Cherise was incapable of giving consent and if the accused knew or had reasonable cause to know that Cherise was incapable of giving consent because she was asleep or unconscious or intoxicated, the act of sexual intercourse was done by force and without her consent.

The judge reminded the members that "any references by counsel to the law or to my instructions do not constitute instructions on the law, which may only be given by me in my judicial capacity." Later, he again reminded them that they were bound by his statements of the law; that is, witnesses and counsel cannot tell members what the law is.

## DISCUSSION

Appellant argues the judge incorrectly defined "consent" and "intoxication" for the panel. Appellant contends this instruction perpetuated the erroneous legal definitions the CID agent gave to appellant during his interrogation, and but for this mistake, the panel would most likely have found the evidence insufficient to convict. Final Brief at 15.

The Government argues appellant waived any issue concerning the instructions given by not objecting at trial. *United States v. Maxwell*, 45 MJ 406, 426 (1996); Answer to Final Brief at 8. In any case, the instruction contained no error, much less plain error. The judge used instructions provided in the Military Judges' Benchbook (DA Pam. 27–9 at 430, 431 (30 Sep 96)) for this situation. Answer at 18.

**34**

■ Instructional error is reviewed *de novo*. *Maxwell*, 45 MJ at 425. Failure to object to an instruction before the panel begins deliberation is waiver of the objection in the absence of plain error. *United States v. Cooper*, 51 MJ 247, 252 (1999); RCM 920(f), Manual for Courts–Martial, United States (1998 ed.). To be plain error: (1) there must be an error; (2) the error must be plain (clear or obvious); and (3) the error must affect the substantial rights of the defendant. *United States v. Powell*, 49 MJ 460, 463 (1998).

■ We hold that there was no error and no prejudice to appellant's substantial rights. There was no objection to the instructions, and the judge explained he was the sole source of law. Additionally, we agree with the court below that "the phrase 'or intoxicated,' in the context of the descriptive terms preceding that phrase and the totality of all the instructions given on this issue, could only be understood to address intoxication to a degree rendering legal consent impossible." Unpub. op. at 9.

■ The Government also argues the evidence was legally sufficient to uphold appellant's conviction. The standard for legal sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

■ We also hold that the evidence was sufficient to have allowed a rational trier of fact to find the necessary elements of the crime of rape beyond a reasonable doubt.

The decision of the United States Army Court of Criminal Appeals is affirmed.