UNITED STATES, Appellee

v.

Robert W. MARTIN, Major
U.S. Army, Appellant

No. 99-0232

Crim. App. No. 9600413

_____

United States Court of Appeals for the Armed Forces

Argued April 17, 2001

Decided November 15, 2001

BAKER, J., delivered the opinion of the Court, in which
CRAWFORD, C.J., GIERKE and EFFRON, JJ., and SULLIVAN, S.J.,
joined.

<u>Counsel</u>

For Appellant: <u>Mr. Mark L. Waple</u> and <u>Mr. Hugh R. Overholt</u>
(argued); <u>Colonel Adele H. Odegard</u> (on brief).

For Appellee: <u>Captain Karen J. Borgerding</u> (argued);
<u>Colonel David L. Hayden</u>, <u>Lieutenant Colonel Edith M. Rob</u>,
and <u>Major Anthony P. Nicastro</u> (on brief).

Military Judge: Keith H. Hodges

<u>**THIS OPINION IS SUBJECT TO EDITORIAL CORRECTION BEFORE FINAL PUBLICATION**</u>.

Judge BAKER delivered the opinion of the Court.

On August 22 and October 23, 1995, and January 13, February 5-9, 13-15, 20-23, and 26-29, 1996, appellant was tried by a general court-martial with members.  Contrary to his pleas, he was found guilty of attempted larceny (one specification); disobedience of a superior officer (four specifications); violating a lawful general regulation (four specifications); larceny (twenty-nine specifications); wrongful appropriation (one specification); forgery (four specifications); making or uttering worthless checks without sufficient funds (four specifications); conduct unbecoming an officer and gentleman (twenty-eight specifications); obtaining services under false pretenses (one specification); and obstructing justice (one specification).  These offenses violated Articles 80, 90, 92, 121, 123, 123a, 133, and 134, Uniform Code of Military Justice (UCMJ), 10 USC §§ 880, 890, 892, 921, 923, 923a, 933, and 934.  Appellant was sentenced to a dismissal, confinement for two years, restriction for two months, and total forfeitures.

Appellant was charged with seventy-nine offenses.  The members found him not guilty of two offenses.  The convening authority disapproved one of the larceny

findings,[1] approved the remaining findings, and approved the sentence, with the exception of the restriction.  The United States Army Court of Criminal Appeals affirmed.  48 MJ 820 (1998).  This Court in 1999 granted review of four issues.[2]

On March 21, 2000, this Court set aside the decision of the court below and remanded the case to that court with

---

[1] The convening authority dismissed specification 12 of Charge IV, a larceny charge, because the members found appellant not guilty of the related conduct unbecoming an officer charge, specification 11 of Charge VII.

[2] Those four issues were:

I.  WHETHER THE EVIDENCE OF RECORD CLEARLY AND CONVINCINGLY ESTABLISHES THAT THE ACCUSED WAS NOT MENTALLY RESPONSIBLE DURING THE PERIOD OF THE CHARGED OFFENSES, EFFECTIVELY OVERCOMING THE PRESUMPTION OF MENTAL RESPONSIBILITY, AND THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT TO REFUTE THE DETERMINATION THAT THE ACCUSED WAS NOT MENTALLY RESPONSIBLE.

II.  WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION FOR FAILING TO RECUSE HIMSELF AFTER BEING CHALLENGED BY THE DEFENSE.

III.  WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS ABUSED ITS DISCRETION BY REFUSING TO RECUSE ITSELF FROM THE REVIEW OF APPELLANT'S CASE FOLLOWING A SEPTEMBER, 1997, ARMY JAGC REGIMENTAL DINING IN ATTENDED BY THE CHIEF JUDGE OF THE ARMY COURT OF CRIMINAL APPEALS AND OTHER SENIOR MEMBERS OF THE U.S. ARMY JAG CORPS, AT WHICH DINING-IN THE APPELLANT AND HIS COURT-MARTIAL CONVICTION WERE OPENLY RIDICULED.

IV.  WHETHER THE UNITED STATES ARMY COURT OF CRIMINAL APPEALS COMMITTED PREJUDICIAL ERROR AND ABUSED ITS DISCRETION BY FAILING TO RECUSE ITSELF FROM CONTINUING THE REVIEW OF APPELLANT'S CASE FOLLOWING A JULY, 1997, AWARDS CEREMONY ATTENDED BY THE THREE APPELLATE JUDGES HEARING APPELLANT'S CASE, AT WHICH CEREMONY THE ASSISTANT ARMY JUDGE ADVOCATE GENERAL FOR MILITARY LAW AND OPERATIONS MADE DISPARAGING REMARKS CONCERNING APPELLANT, AND WHERE THE TRIAL COUNSEL IN APPELLANT'S CASE WAS PRESENTED AN AWARD FOR HER PARTICIPATION IN APPELLANT'S CASE, SIGNED BY THE ACTING CHIEF JUDGE OF THE ARMY COURT OF CRIMINAL APPEALS, AND BY DENYING APPELLANT'S MOTION TO ENTER AFFIDAVITS IN SUPPORT OF SUCH MOTION TO RECUSE INTO THE RECORD.

the following instruction:

> With respect to Issue I, it is not apparent what standard was employed by the Court of Criminal Appeals in addressing the question of whether appellant carried his "burden of proving the defense of lack of mental responsibility by clear and convincing evidence." See Art. 50a(b), Uniform Code of Military Justice, 10 USC § 850a(b). Therefore, it is necessary to return the record to the Judge Advocate General for remand to the Court of Criminal Appeals for reconsideration of that question. On reconsideration, the court will determine whether the court-martial's finding that appellant did not prove lack of mental responsibility by clear and convincing evidence was correct both in law and in fact. See Art. 66(c), UCMJ, 10 USC § 866(c); United States v. Turner, 25 MJ 324 (CMA 1987).

> In determining whether the members' finding was correct in fact, the court must weigh the evidence and determine for itself whether appellant proved the defense of lack of mental responsibility by clear and convincing evidence. In determining whether the finding was correct in law, the court must view the evidence and all reasonable inferences in the light most favorable to the Government and determine whether a court-martial composed of reasonable members could have found that appellant failed to prove lack of mental responsibility by clear and convincing evidence. See generally Jackson v. Virginia, 443 U.S. 307, 319 (1979).[3]

---

[3] The order also provided:

> With respect to Issue II, the military judge was not required to recuse himself under the facts and circumstances of this case. See RCM 902(a), Manual for Courts-Martial, United States (1998 ed.).

> With respect to Issues III and IV, in view of the necessity for a remand, it appears that any further review by the Court of Criminal Appeals should be conducted by a panel of judges who were not present during either of the incidents that gave rise to Issues III and IV. This action is taken in the interests of judicial economy and does not reflect a decision on the question

United States v. Martin, No. 99-0232/AR

53 MJ 221-22 (2000).

On August 7, 2000, the United States Army Court of Criminal Appeals issued an Opinion of the Court on Remand, again affirming the findings and sentence. 53 MJ 745 (2000). We then granted review of two issues.[4]

The affirmative defense of lack of mental responsibility requires proof that at the time of the offense(s), the accused: (1) suffered from a "severe mental disease or defect" and (2) as a result, was "unable to appreciate the nature and quality or the wrongfulness of the acts." Art. 50a(a), UCMJ, 10 USC § 850a(a). The second element of this test is disjunctive. An accused may

---

of whether the particular judges who originally reviewed this case should have disqualified themselves. To the extent that appellant seeks to disqualify all Army judge advocates from serving as appellate judges, such action is not warranted under the facts and circumstances of this case.

[4] Those two issues were:

    I.  WHETHER THE EVIDENCE OF RECORD CLEARLY AND CONVINCINGLY
    ESTABLISHES THAT APPELLANT WAS NOT MENTALLY RESPONSIBLE
    DURING THE PERIOD OF THE CHARGED OFFENSES, EFFECTIVELY
    OVERCOMING THE PRESUMPTION OF MENTAL RESPONSIBILITY, AND
    THE GOVERNMENT'S EVIDENCE WAS INSUFFICIENT TO REFUTE THE
    DETERMINATION THAT APPELLANT WAS NOT MENTALLY RESPONSIBLE.

    II.  WHETHER THE ARMY COURT OF CRIMINAL APPEALS APPLIED AN
    OVERLY RESTRICTIVE STANDARD IN DETERMINING WHETHER
    APPELLANT PREVAILED AT TRIAL IN THE DEFENSE OF LACK OF
    MENTAL RESPONSIBILITY BY LIMITING ITS REVIEW TO WHETHER
    APPELLANT ESTABLISHED LACK OF MENTAL RESPONSIBILITY AT THE
    PRECISE MOMENT OF HIS MULTIPLE ACTS OF CHARGED MISCONDUCT
    AND BY REJECTING APPELLANT'S EVIDENCE THAT HE WAS NOT
    MENTALLY RESPONSIBLE DURING THE PERIOD THAT HIS MULTIPLE
    ACTS OF MISCONDUCT OCCURRED.

logically and legally satisfy this test by demonstrating that he or she lacked mental responsibility over a period of time that includes the time(s) of the offense(s). However, as in this case, the Government may logically and legally rebut this by demonstrating that the proponent of this defense was mentally responsible at specific times during the time period in question. Therefore, applying a substantial evidence standard of review to a jury finding of fact,[5] we hold that a reasonable trier of fact could have found that appellant failed to prove by clear and convincing evidence his affirmative defense of lack of mental responsibility.

### FACTS

Appellant was a career Judge Advocate General's Corps (JAGC) Major with over twenty years of service. As noted by the court below:

> There is no substantial dispute about what appellant did in this case. Between September 1992 and March 1995, appellant obtained approximately $100,000 from more than thirty victims in a complex web of unlawful, fraudulent, or unethical conduct that may be grouped into four categories: (1) unpaid personal loans, (2) fraudulent investment schemes, (3) unauthorized and incomplete legal services, and (4) worthless checks.

48 MJ at 821; see 53 MJ at 746.

---

[5] See infra, _MJ at (25).

6

The issue at trial and on appeal was whether appellant was mentally responsible for these offenses.  The evidence presented by the defense and the Government is summarized below.

## Defense Experts

A Sanity Board evaluation was requested by military defense counsel, directed by the convening authority, and performed by Drs. Orman and Hardaway.  On June 14, 1995, they opined that at the time of the offenses, appellant did not suffer from a severe mental disease or defect, did appreciate the nature and quality or wrongfulness of his conduct, and could understand and participate in the proceedings against him.  Several months later, however, appellant underwent extensive psychological testing by a psychologist, Dr. Costello, that indicated possible bipolar disorder.  And after appellant was diagnosed with the disease by a psychiatrist, Dr. Bowden, the trial judge ordered Drs. Orman and Hardaway to reconvene to reconsider "the previous findings in light of this information made available by the defense."  The reevaluation by Drs. Orman and Hardaway indicated that at the time of the offenses, appellant suffered from a severe mental disease or defect, namely Bipolar Disorder; that appellant was unable to appreciate the nature and quality or wrongfulness of his

conduct "while experiencing the manic episodes" (emphasis added); and that appellant was able to participate in his own defense "with concerns that the clinical course of the bipolar disorder is variable even with treatment."

Dr. Costello testified that bipolar disorder is based on the concepts of denial and grandiosity. One denies one is incompetent, inadequate, and impotent and substitutes for that a grandiose self-image. "Anything in the world is possible. Any scheme is foolproof. Anything will succeed." Dr. Costello also testified that the link between appellant's grandiose self-image and his ability to appreciate the nature, quality and wrongfulness of his behavior was direct. He testified that appellant substitutes a grandiose reality to enhance his self-image, i.e., "There's not a problem that I can't solve. There's not a deal that I can't do. There's not a situation that I can't fix."

Dr. Costello stated, "That's what the psychotic reality is of the manic-depressive patient, and that's what I think was occurring between '92 and '94. He felt miserable and substituted this other reality where anything – the sky was the limit." He concluded that it is "the disassociation, the denial and the grandiosity that causes the manic patient to be unable to be aware, to be conscious

and knowledgeable of the nature, quality, and wrongfulness of their behavior at the moment the behavior takes place."

Dr. Bowden, appellant's treating psychiatrist, diagnosed appellant with bipolar-1 disorder, or manic-depressive illness. Appellant began taking a mood stabilizer, Depakote, just prior to the court-martial proceedings. Dr. Bowden testified that appellant had recurrent hypomanic episodes, that his behavior fluctuated from month-to-month and from week-to-week, and that he had ultra-rapid cycling, which means a change in behavior within a period of hours. He testified that ultrarapid cycling means that the disease of manic-depression is usually more severe.

When Dr. Bowden was asked whether appellant knew that forging people's names to documents was wrong the following exchange took place:

> A:  Knowing – not in a sense that it could affect his behavior because he felt justified at [sic], if not all, most of those points in what he was doing.  He felt he was serving the greater good. He was going to make himself and these other people wealthy by virtue of what he was doing, so . . .

> Q:  Sir, do you understand that in the military just because it doesn't violate his own personal moral code, that doesn't mean that it's not wrong?

> A:  What he did had nothing to do with moral code.  It had to do with the misperception of the prospects of this cockamamie venture succeeding.
>
> Q:  So he thought it wasn't wrong because he thought this would succeed?
>
> A:  I think in – yes, he thought that he was going to give people unreasonable returns on their investment in short periods of time, and lost credibility in his own career in the process.

Dr. Bowden further testified that to be manic is to be severely functionally impaired, and that the only difference between mania and hypomania is that the duration or the severity is viewed as shorter or does not entail some evidence of severity such as hospitalization.  He also testified:

> There was no way for me to link descriptions of periods when he was symptomatic with each and every incident which he committed in relationship to taking money.  There was simply no way to do that.  The only way is that in some of the instances he clearly was delusional in his thinking about them and grandiose in his thinking, and those where that was described as part of the recollection of the various individuals of his behavior, it supports the diagnosis of manic and hypomanic, and/or hypomanic, and in some instances depressed episodes at the time, but there is no way to determine either negatively or positively for each and every incident.

A third defense expert in psychiatry, Dr. Francis, testified that in his opinion, appellant was "impaired"

during part, but not all, of the time period covered by the charged misconduct.  Dr. Francis testified that appellant may have understood that his acts were illegal, but committed them because he believed they were for a greater good, i.e., that he would deliver on his promises.

### Government Experts

The government experts, who did not examine appellant for treatment purposes, were forensic psychiatrists who examined appellant for purposes of preparing the prosecution for trial.[6]  Their focus was on whether the evidence demonstrated that appellant was legally mentally incompetent, as defined by the UCMJ, at the time of the charged offenses.  In particular, they focused on two main points, the degree of impairment suffered by appellant, and the effect that various degrees of impairment had on appellant's ability to appreciate the nature and quality and the wrongfulness of his acts at the time of the offenses.  The consensus of the government experts was that

---

[6] The main government witness, a forensic psychiatrist, Dr. Moore, did not interview appellant until approximately one month after appellant was prescribed and had been taking Depakote.  Drs. Sparks and Raisani, also forensic psychiatrists, did not interview appellant at all, but based their testimony on a review of documents and witness statements.

11

appellant was not psychotic but was hypomanic and suffered at least one manic episode during that time period. They also agreed that appellant could appreciate the wrongfulness of his acts.

Dr. Moore testified that people are psychotic if they have "a disturbance in the form of their thought, the pattern, the way that they put their thoughts together, or it may mean they have delusions, or it may mean they have hallucinations." Additionally, Dr. Moore testified that it could also be defined "as a complete break between reality and fantasy, where they are unable to distinguish between the two." He also testified that people considered manic have, by definition, impairment in their functioning, and that a person who is hypomanic could be, but is not always, impaired.

As to the charged offenses, Dr. Moore testified that in his assessment, appellants scheme to sell Spurs tickets and the Honeybaked Ham franchise scheme, while possibly unwise or unjustified, were not delusions; rather, they were grounded in reality. As to the other offenses, Dr. Moore testified that he reviewed the statements of the victims and looked for behavioral observations. Dr. Moore did not find any examples of victims describing appellant as acting really bizarre or strange. He noted, however,

12

that a few statements made by friends and acquaintances indicated "different periods of time where [appellant] showed hypomanic symptoms" or "depressed symptoms." Dr. Moore indicated that it might be possible to extrapolate and link the time periods indicated in those statements that showed hypomanic or depressed symptoms to the time periods of the charged offenses, but that there was no direct evidence from the victims that showed such symptoms.

Dr. Moore concluded that appellant was not psychotic, and that he suffered from hypomanic rather than manic episodes during the timeframe at issue. Dr. Moore based this on both the complexity of the crimes that involved writing checks and making promissory notes and on appellant's attempts to conceal the true nature of what he was doing.

Dr. Sparks, also a forensic psychiatrist, testified that in order for bipolar illness to relieve criminal responsibility, it must rise to the level that the person cannot differentiate between reality and a delusion. He also testified that concealment would play a part in determining whether someone could appreciate the criminality of his acts.

Dr. Raisani, a forensic psychiatrist, testified that "[c]linically an individual cannot really be at the same

level for two years.  One cannot have the same intensity of bipolar disorder across the board for 24 hours a day." He also testified that concealment is an important part of determining whether someone could appreciate the nature and quality or the wrongfulness of his acts.  Specifically, he cited examples where appellant asked that checks be made out to someone else for work to be performed by appellant; stated to another individual that "I cannot officially work for you"; told another person with respect to a loan that "finance has made a mistake and stopped the wrong allotment"; moved to a separate location, closed the door, and said he was not allowed to do this before accepting $1,700 in cash.  Dr. Raisani found it significant that only two or three statements out of the twenty or thirty provided to him reflected rapid speech or some indication of bipolar disorder.

### Lay Witnesses

The court below found the following facts:

> 1.  Appellant committed virtually all of these offenses away from his office.  Appellant generally told his legal clients that he was not permitted to perform the needed legal service himself, but that he had a friend or relative who could provide the service.  Appellant then usually obtained a retainer check for the friend or relative, which was to be returned after the legal work was completed.  He would then forge the payee's signature and cash the check.

14

Appellant sometimes asked for payment in cash and made numerous excuses to avoid giving a receipt.

2.  When appellant was pressured to write a refund check to a complaining victim, he initially paid these debts with worthless checks. He frequently forged his wife's signature rather than sign his own.  Appellant wrote his victims eighteen worthless checks, totaling more than $18,000.00, on an account that he knew had been closed since November 1990.  When a check "bounced" and a victim threatened to report appellant's misconduct to his command or the police, appellant usually paid the debt in question, often in cash or with a check from another investor or client.  Occasionally, appellant begged his victims not to report him because he would lose his retirement.

3.  Appellant's OERs [Officer Efficiency Reports] from 1988 until the discovery of these offenses in early 1994 reflect a solid, professional duty performance except for an overweight condition attributed to a knee problem.  These OERs do not indicate that appellant failed to understand or follow Health Services Academy rules and training schedules or that he taught his classes in anything but a timely and professional manner.  None of these OERs stated anything that would indicate appellant was suffering from any mental impairment or that he was not occupationally fully functional in the academic environment.

4.  Unlike most appellants, this appellant was a JAGC officer and an ethics counselor with unique training and experience concerning criminal and ethical offenses, including the consequences for violating them.

5.  Appellant's brother testified that, in December 1994, appellant bragged to him that he could "con anybody into doing what he wanted."

48 MJ at 823-24; see 53 MJ at 746.  Additionally, on remand, the court below found:

15

> There was also substantial testimony by lay witnesses concerning many irrational, even bizarre, acts of appellant, including actions or activities that were consistent with the diagnosis of bipolar disorder. At the times of the various illegal activities, however, no witness described appellant's conduct as bizarre or aberrant. There was also substantial lay testimony that the witnesses had no difficulty understanding or following appellant's conversations, although he tended to talk fast and to change subjects abruptly (which are also indications of bipolar disorder). Witnesses also testified that appellant had no difficulty communicating the plans he devised as investment opportunities, in convincing numerous persons to invest money in his schemes, or to loan appellant money. When later approached by an "investor" or creditor, usually seeking reimbursement of funds given to appellant, appellant had no difficulty remembering the transaction at issue and usually was able to convince the creditor that there was a rational, innocent explanation for appellant's failure to reimburse.

53 MJ at 748-49.

### ISSUE I

The defense of lack of mental responsibility (the insanity defense) is codified in Article 50a, UCMJ, which is substantively identical to 18 USC § 17. Article 50a remains unchanged since it was enacted in the Military Justice Amendments of 1986,[7] following enactment of similar legislation applicable to the federal civilian courts in The Insanity Defense Reform Act of 1984.[8] As articulated by

---

[7] Pub. L. No. 99-661, § 802(a)(1), 100 Stat. 3905-06.

[8] Pub. L. No. 98-473, § 402(a), 98 Stat. 2057, renumbered Pub. L. No. 99-646, § 34(a), 100 Stat. 3599.

the court below, this act was intended, inter alia, to narrow the definition of insanity, shift the burden of proof to the accused to prove the defense by clear and convincing evidence, and prohibit expert testimony on the ultimate legal issue, thus leaving the ultimate issue to the trier of fact alone.

Under Article 50a(a), lack of mental responsibility is an affirmative legal defense requiring proof that the accused, at the time of the offenses: (1) suffered from a "severe mental disease or defect," and (2) as a result of that disease, was "unable to appreciate the nature and quality or the wrongfulness of the acts."  Federal courts have recognized that proof is required on each element of the defense.  See United States v. Dixon, 185 F.3d 393, 399 (5th Cir. 1999)(The plain language of 18 USC § 17 instructs that the defendant must show that (1) "as a result of a severe mental disease" (2) he "was unable to appreciate the nature and quality or the wrongfulness of his acts."); United States v. Shlater, 85 F.3d 1251, 1257 (7th Cir. 1996)(The accused must prove by clear and convincing evidence first, "that he suffered from a severe mental disease or defect," and second, "that his severe mental disorder rendered him unable at the time of the crime to

17

appreciate the nature and quality or the wrongfulness of his acts.").

At trial, it was undisputed that appellant's bipolar disorder qualified as a severe mental disease or defect under Article 50a(a) with respect to the entire time period during which all charged offenses occurred.  Accordingly, the only factual matter before the members was whether, as a result of his disease, he was "unable to appreciate the nature and quality or the wrongfulness of the acts."

Article 50a(b) provides that the "accused has the burden of proving the defense of lack of mental responsibility by clear and convincing evidence."  Clear and convincing evidence is that weight of proof which "produce[s] in the mind of the factfinder a 'firm belief or conviction' that the allegations in question are true." Clifford S. Fishman, Jones on Evidence:  Civil and Criminal § 3:10 at 239 (7th ed. 1992); United States v. Montague, 40 F.3d 1251, 1255 (D.C. Cir. 1994); Child v. Child, 332 P.2d 981, 986 (Utah 1958).  The insanity defense is unusual among affirmative defenses in that it is currently one of only two defenses under the UCMJ for which the accused, not the Government, bears the burden of proof at trial. Moreover, the burden never shifts back to the Government to

prove sanity beyond a reasonable doubt.[9]  In addition, mental responsibility is the only affirmative defense for which the jury is instructed to vote on a finding of fact distinct from its finding of guilt.  RCM 921(c)(4), Manual for Courts-Martial, United States (2000 ed.).[10]

### Standard of Review

### Review of findings of guilt

In our remand order, we required the court below to reconsider the question of "what standard was employed. . . in addressing the question of whether appellant carried his 'burden of proving the defense of lack of mental responsibility by clear and convincing evidence.'"  We also directed that court to "determine whether the court-martial's finding that appellant did not prove lack of mental responsibility by clear and convincing evidence was correct both in law and in fact."  53 MJ at 221, citing

---

[9] RCM 916(b), Manual for Courts-Martial, United States (2000 ed.), provides:

> (b) Burden of proof.  Except for the defense of lack of mental responsibility and the defense of mistake of fact as to age . . . in a prosecution of carnal knowledge, the prosecution shall have the burden of proving beyond a reasonable doubt that the defense did not exist.

This rule was amended after appellant's court-martial to include mistake of fact as to age in a carnal knowledge case.  However, the current language dealing with lack of mental responsibility is substantially the same as the language in effect at the time of appellant's court-martial.

[10] The current version of this rule is identical to the one in effect at the time of appellant's court-martial.

19

United States v. Martin, No. 99-0232/AR

Art. 66(c), UCMJ, 10 USC § 866(c); United States v. Turner, 25 MJ 324 (CMA 1987). We articulated the following tests for the court to apply:

> In determining whether the members' finding was correct in fact, the court must weigh the evidence and determine for itself whether appellant proved the defense of lack of mental responsibility by clear and convincing evidence. In determining whether the finding was correct in law, the court must view the evidence and all reasonable inferences in the light most favorable to the Government and determine whether a court-martial composed of reasonable members could have found that appellant failed to prove lack of mental responsibility by clear and convincing evidence.

Id. at 222, citing Jackson, 443 U.S. at 319. In an effort to address appellant's burden of proof on his insanity defense, we inserted "clear and convincing" into the Turner and Jackson tests for reviewing findings of guilt, both of which require proof beyond a reasonable doubt. See In re Winship, 397 U.S. 358, 364 (1970), and Turner, 25 MJ at 325.

In reviewing the findings of guilt, the lower court correctly noted that "[s]hifting the burden of proof on mental responsibility to the accused does not, however, change the standard of review or the tests for either factual or legal sufficiency." 53 MJ at 747. That court was correct with respect to review of findings of guilt for

20

factual and legal sufficiency under the Jackson and Turner tests.

The court below also concluded, as did the court-martial, "that appellant failed to carry his burden of proving, by clear and convincing evidence, that he lacked the ability to appreciate the nature and quality or the wrongfulness of his acts constituting any specific offense." Id. at 749. Implicit in this conclusion is the lower court's review of the non-guilt finding of fact by the court-martial (in this case, the members) as well as its findings of guilt. We agree with the conclusion of the court below for the following reasons.

### Review of non-guilt findings of fact

This review is conducted separately from the review of the findings of guilt and allows the reviewing court to apply the appropriate degree of deference to the decision of the factfinder and the applicable burden of proof to the party carrying the burden.

The distinction between findings of guilt and non-guilt findings of fact as to whether a defendant has proven lack of mental responsibility is clear from RCM 921(c)(4), which provides for two separate votes:

> Not guilty only by reason of lack of mental responsibility. When the defense of lack of mental responsibility is in issue under RCM

21

916(k)(1), the members shall first vote on whether the prosecution has proven the elements of the offense beyond a reasonable doubt. If at least two-thirds of the members present (all members for offenses where the death penalty is mandatory) vote for a finding of guilty, then the members shall vote on whether the accused has proven lack of mental responsibility. If a majority of the members present concur that the accused has proven lack of mental responsibility by clear and convincing evidence, a finding of not guilty only by reason of lack of mental responsibility results. If the vote on lack of mental responsibility does not result in a finding of not guilty only by reason of lack of mental responsibility, then the defense of lack of mental responsibility has been rejected and the finding of guilty stands.

(Emphasis added.) The result of this separate vote is that the members first determine whether the prosecution proved the elements of the offense beyond a reasonable doubt and then decide, as a factual matter, whether the accused proved his affirmative defense of lack of mental responsibility by clear and convincing evidence.

It is the second vote by the members, on the defense of lack of mental responsibility, that is at issue. In other contexts, this court has reviewed non-guilt findings of fact under the clearly erroneous standard of review. See, e.g., United States v. Allen, 53 MJ 402 (2000)(finding that affidavit in support of search warrant was not knowingly and intentionally false nor made with reckless disregard for the truth); United States v. Starr, 53 MJ 380

(finding that there was no intent to punish); United States v. Chaney, 53 MJ 383 (2000) (finding that there was no purposeful discrimination); United States v. Youngman, 48 MJ 123 (1998)(finding that decision to prosecute was not independent of immunized testimony); United States v. Maxwell, 45 MJ 406 (1996)(finding that appellant had a subjective expectation of privacy); United States v. Kelley, 45 MJ 275 (1996)(finding that declarant had expectation of medical benefit under Mil. R.Evid. 803(4), Manual for Courts-Martial, United States (1995 ed.)); United States v. Radvansky, 45 MJ 226 (1996)(finding that appellant voluntarily consented to search); United States v. Proctor, 37 MJ 330 (CMA 1993)(finding that appellant was mentally competent to stand trial).

In these cases, the non-guilt findings were made by the military judge, because they involved preliminary questions of law and fact.  However, in cases where trial by members is selected and the affirmative defense of mental responsibility is raised, the members are responsible for making a separate non-guilt finding as to whether an accused carried his burden of proving the defense by clear and convincing evidence.  RCM 921(c)(4).

Other federal courts have approached the review of factual findings on this affirmative defense by applying

23

either the "clearly erroneous" or "reasonableness" standard

of review.  The two approaches devolve from the difference

in the deference accorded to review of non-guilt findings

of fact made by judges and those made by juries.

### The Clearly Erroneous Standard of Review

In reviewing non-guilt findings of fact made by

judges, federal courts apply the "clearly erroneous"

standard.  See 2 Steven Childress and Martha Davis, Federal

Standards of Review § 10.04 at 10-12 to 10-13 (3d ed.

1999).  With respect to this question, the Supreme Court

held:

> As this Court frequently has emphasized,
> appellate courts are not to decide factual
> questions de novo, reversing any findings they
> would have made differently.  See, e.g., Anderson
> v. Bessemer City, 470 U.S. 564, 573 (1985);
> Zenith Radio Corp. v. Hazeltine Research, Inc.,
> 395 U.S. 100, 123 (1969).  The Federal Rules of
> Criminal Procedure contain no counterpart to
> Federal Rule of Civil Procedure 52(a), which
> expressly provides that findings of fact made by
> the trial judge "shall not be set aside unless
> clearly erroneous."  But the considerations
> underlying Rule 52(a) – the demands of judicial
> efficiency, the expertise developed by trial
> judges, and the importance of first-hand
> observation, see Anderson, supra at 574-575 – all
> apply with full force in the criminal context, at
> least with respect to factual questions having
> nothing to do with guilt.  Accordingly, the
> "clearly erroneous" standard of review long has
> been applied to non-guilt findings of fact by
> district courts in criminal cases.  See Campbell
> v. United States, 373 U.S. 487, 493 (1963); 2 C.
> Wright, Federal Practice and Procedure § 374 (2d
> ed. 1982).

24

United States v. Martin, No. 99-0232/AR

Maine v. Taylor, 477 U.S. 131, 145 (1986).

The Supreme Court, in a different context, explained that "[a] finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."  United States v. United States Gypsum Co., 333 U.S. 364, 395 (1948).

In the case of bench trials, federal courts have applied the "clearly erroneous" standard to the finding of fact on lack of mental responsibility/insanity.  United States v. Freeman, 804 F.2d 1574, 1577 (11th Cir. 1986)(the district court finding that the defendant had failed to prove by clear and convincing evidence that he was unable to appreciate the nature and quality of his acts at the time of the offense was not clearly erroneous); United States v. Reed, 997 F.2d 332, 334 (7th Cir. 1993) ("[W]hether [the defendant] has proven that he was legally insane at the time he robbed the bank is a question to be decided by the trier of fact . . .  and we will not reverse that finding unless it is clearly erroneous."); United States v. Hiebert, 30 F.3d 1005, 1007 (8th Cir.), cert. denied, 513 U.S. 1029 (1994)("Whether a defendant has

25

proven that he was legally insane is a factual question, and we will reverse the trial court's finding only if it is clearly erroneous.").

Jury Deference:
The "Substantial Evidence" Standard of Review.

By contrast, for some time, federal courts have employed the "substantial evidence" standard for reviewing factual determinations by a jury.  Glasser v. United States, 315 U.S. 60, 80 (1942).  This is in great part due to the constitutional deference accorded the role of juries over that of judges.  Duncan v. Louisiana, 391 U.S. 145, 156 (1968)("the jury trial provisions in the Federal. . . Constitution[] reflect a fundamental decision about the exercise of official power--a reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.").  The Supreme Court has described "substantial evidence" as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,. . . and it must be enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury."  NLRB v. Columbian Enameling & Stamping Co., 306 U.S. 292, 300 (1939)(emphasis added) (internal citation omitted).

United States v. Martin, No. 99-0232/AR

As explained by Professors Childress and Davis, substantial evidence and the reasonableness test are "two facets of the same standard: In order for a reasonably minded jury to find guilt beyond a reasonable doubt, there must be a quantum of evidence in support of that finding amounting to substantial, assuming that all doubtful areas are resolved in favor of the jury's verdict." Federal Standards of Review, supra, §9.03 at 9-11. Accordingly, Childress and Davis have also noted with respect to the Supreme Court decision in Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133 (2000), that

> the U.S. Supreme Court settled the circuit
> conflict in favor of whole record review. Now it
> is clear that "both sides" of the record are
> considered in applying the usual test of
> reasonableness to a jury decision or factfinding.

1 Federal Standards of Review, supra, §3.01 at 15 (2000 Supp.).

The Fifth Circuit has further refined this test of "reasonableness" in employing the standard of review to non-guilt findings of fact made by juries regarding mental responsibility. Specifically, the Fifth Circuit has determined that an appellate court "should reject the jury verdict [on insanity] . . . only if no reasonable trier of fact could have failed to find that the defendant's criminal insanity at the time of the offense was

27

established by clear and convincing evidence." See United States v. Barton, 992 F.2d 66, 68 (5th Cir. 1993); United States v. Abou-Kassem, 78 F.3d 161, 166 (5th Cir.), cert. denied, 519 U.S. 818 (1996). Such an appellate determination, in turn, depends on whether there is substantial evidence in the record supporting the jury's finding of fact.

We agree with the Fifth Circuit's approach in the case of a non-guilt finding of fact by members on the question of mental responsibility. Such a test of reasonableness is consistent with congressional intent that determinations of mental responsibility are for the trier of fact to make alone, and not experts offering ultimate opinions. It also recognizes that the trier of fact is better positioned than are appellate courts to appraise and weigh the evidence and apply the appropriate burden of proof to the party that bears the burden. This may be particularly true of an insanity defense, such as that presented in this case, where there are multiple competitive experts, complex facts, and numerous witnesses testifying to the accused's demeanor at the time of offense.

A reasonableness standard is also appropriate because appellate courts have only a jury's conclusion, implicit in an ultimate finding of guilt, against which to test for

28

error.  In contrast, where a trial judge makes a finding of fact on mental responsibility, an appellate court tests for clear error - against the judge's specific findings of fact, included in the record, underpinning his or her conclusion.  Finally, the reasonableness standard is consistent with our preference for, and deference afforded to, juries in our constitutional system of justice.

### Elements of the Insanity Defense at Issue

During the cross-examination of one of the defense experts, Dr. Costello, the parties agreed to a "legal definition" of "appreciate."  The military judge instructed the members that

> the word "appreciate" in terms of that a person was unable to appreciate the nature and quality of his acts, appreciation has three components, that is, a person is aware, that they are conscious of that, which is a type of awareness, and that they know it.

The word "appreciate" was chosen with legislative care.

> The choice of the word "appreciate," rather than "know" in the first branch of the test also is significant; mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance.

United States v. Freeman, 357 F.2d 606, 623 (2d Cir. 1966).

This construct mirrors that contained in the legislative history.  While Congress otherwise chose to adopt the

framework laid out in M'Naghten's Case, 8 Eng. Rep. 718 (1843), in this word choice,

> Congress adopted the language of the Model Penal Code rather than the M'Naghten rule ("appreciate" vs. "know") and thereby broadened the inquiry. Model Penal Code § 4.01 comment 2 at 166 ("[K]now" leads to an excessively narrow focus on "a largely detached or abstract awareness that does not penetrate to the affective level."); S.Rep. No. 307, 97th Cong., 1st Sess. 100-01 (1981) (Model Penal Code "uses the more affective term 'appreciate' for the more coldly cognitive 'know' of M'Naghten."), referred to in S.Rep. No. 225, 98th Cong., 2d Sess. (1984), reprinted in 1984 U.S.C.C.A.N. 3182, 3404 n. 1; accord ABA Criminal Justice Mental Health Standards 7-6.1 at 343-44 (1989).

United States v. Meader, 914 F.Supp. 656, 658 n.2 (D. Me. 1996).

Before this Court, appellant asserts that the focus should not only be on the word "appreciate," but on the terms that follow, "nature and quality" or "wrongfulness." Appellant further argues that these terms should be read in the disjunctive. Thus, lack of mental responsibility can be established alternatively by clear and convincing evidence of an inability to (1) "appreciate" the "nature and quality" of the criminal act, or (2) "appreciate" the "wrongfulness" of the criminal act. This seems self-evident from the plain language of the article and is the view of this Court.

As a result of this construction, appellant claims that it was error for the court below to not specifically address whether appellant was able to "appreciate" the "nature and quality" of his criminal acts and to only focus on whether appellant could "appreciate" the "wrongfulness" of his acts.

Unlike the word "appreciate," the terms "nature and quality" and "wrongfulness" were not individually defined at trial. Nevertheless, the words and phrases contained in Article 50a are not devoid of meaning. The terms "nature and quality" and "wrongfulness" were part of the M'Naghten test. The pertinent language is:

> [T]o establish a defence on the ground of insanity, it must be clearly proved that, at the time of the committing of the act, the party accused was labouring under such a defect of reason, from disease of the mind, as not to know the <u>nature and quality</u> of the act he was doing; or, if he did know it, that he did not know he was doing what was <u>wrong</u>.

M'Naghten's Case, supra at 722 (emphasis added).

The M'Naghten language reflected a trend away from the medieval and renaissance requirement that a defendant "lack understanding of good and evil or be devoid of all reason," a mens rea test, toward a more relaxed standard that recognized that a person might also not be convicted who "delusionally perceived facts that amounted to a

31

justification."  Christopher Slobogin, An End to Insanity:
Recasting the Role of Mental Disability in Criminal Cases,
86 Va.L.Rev. 1199, 1208-10 (2000).

"Nature and quality" and "wrongfulness" have otherwise
been explained as follows:

> The first portion relates to an accused who is
> psychotic to an extreme degree.  It assumes an
> accused who, because of mental disease, did not
> know the nature and quality of his act; he simply
> did not know what he was doing.  For example, in
> crushing the skull of a human being with an iron
> bar, he believed that he was smashing a glass
> jar.  The latter portion of M'Naghten relates to
> an accused who knew the nature and quality of his
> act.  He knew what he was doing; he knew that he
> was crushing the skull of a human being with an
> iron bar.  However, because of mental disease, he
> did not know that what he was doing was wrong.
> He believed, for example, that he was carrying
> out a command from God.

2 Charles E. Torcia, Wharton's Criminal Law § 101 at 17
(15th ed. 1994).

Although often used, the term "nature and quality" has
rarely been defined in modern jurisprudence.  Even the
legislative history of 18 USC § 17 does not parse this
phrase as it does the word "appreciate."  Two jurisdictions
that have defined the phrase have given it different shades
of meaning.  Under Pennsylvania state law, "[t]he nature of
an act is that it is right or wrong.  The quality of an act
is that it is likely to cause death or injury."
Commonwealth v. Young, 572 A.2d 1217, 1226 (Pa. 1990),

United States v. Martin, No. 99-0232/AR

cert. denied, 511 U.S. 1012 (1994).   By contrast, the

Court of Criminal Appeals of Texas has stated:

> The "nature of an act," as defined in the Century
> Dictionary, is "the attributes which constitute
> the thing, and distinguish it from all others,"
> while "the quality of an act" is defined to be
> the power to clearly and distinctly apprehend its
> nature. . . .

Montgomery v. State, 151 S.W. 813, 817 (Tex. Crim. App.

1912).

In essence, the Pennsylvania and Texas definitions

both recognize what is inherent in the M'Naghten test, that

a defendant who is unable to appreciate the nature and

quality of his acts is one that does not have mens rea

because he cannot comprehend his crimes, including their

consequences.   The Military Judges' Benchbook captures this

concept by offering an instruction that

> if the accused had a delusion of such a nature
> that (he) (she) was unable to appreciate the
> nature and quality or wrongfulness of (his)(her)
> acts, the accused cannot be held criminally
> responsible for (his)(her) acts, provided such a
> delusion resulted from a severe mental disease or
> defect.

Para. 6-4, Note 2, Department of the Army Pamphlet 27-9 (1

April 2001).[11]

---

[11] The Benchbook provision applicable at appellant's trial also captured this concept, although it used slightly different language.

On the question of wrongfulness, appellant claims that he believed he was morally justified because he believed that some of his financial schemes would ultimately make his victims rich. Other federal circuits recognize that a defendant's delusional belief that his criminal conduct is morally or legally justified may establish an insanity defense under federal law. United States v. Dubray, 854 F.2d 1099 (8th Cir 1988). However, the Eighth Circuit has also held that "[t]he jury should be instructed on the distinction between moral and legal wrongfulness . . . only where evidence at trial suggests that this is a meaningful distinction in the circumstances of the case." Id. at 1101. For example, evidence of concealment can rebut claims of legal and moral justification, negating the need to address legal and moral justification separately. See Freeman, 804 F.2d at 1577 (evidence demonstrating that the defendant knew robbing a bank was wrongful included, changing clothes after robbing the bank to avoid identification, employing a mask, handgun, and satchel to execute the robbery and avoid apprehension, informing bank personnel that if the police were called, he would come back and kill everyone, running from police to avoid apprehension, and the probation officer's observation of defendant's demeanor as entirely appropriate following his

United States v. Martin, No. 99-0232/AR

arrest); United States v. Newman, 889 F.2d 88 (6th Cir.
1989), cert. denied, 495 U.S. 959 (1990)(there was
sufficient evidence to sustain conviction for interstate
transportation of stolen property and stolen motor vehicle,
in light of evidence relating to defendant's performance of
intricate and delicate tasks, driving rig, negotiating for
sale of shingles, fabricating story to mislead arresting
officers, and orientation as to time, place, and person);
Reed, 997 F.2d at 334 (defendant admitted he knew that the
voices were telling him to do something wrong); Hiebert, 30
F.3d at 1007 (evidence of defendant's attempt to conceal
involvement in murder-for-hire scheme was relevant to
whether defendant appreciated the wrongfulness of
distributing marijuana and possessing firearm; "knowledge
that one crime was wrong evidences that he understood that
other criminal acts were inappropriate").

### Appellant's Ability to "Appreciate" the "Nature and Quality" or the "Wrongfulness" of his Conduct

As described by the court below, between September
1992 and March 1995, appellant obtained approximately
$100,000 from more than thirty victims:

> Appellant borrowed more than $26,000.00 in
> personal loans, some of which he secured with
> forged promissory notes.  Appellant received
> approximately $20,000.00 for legal services that
> he was not authorized to perform and never
> completed.  Appellant collected almost $30,000.00

35

> in investment schemes for a "honey baked ham"
> concession at the installation post exchange,
> season tickets for the San Antonio Spurs
> professional basketball team, and a land deal.
> Appellant wrote forty-three worthless checks
> totaling more than $28,000.00.

48 MJ at 821.  In addition, appellant threatened an individual who threatened to testify against him.

On appeal, appellant claims that he neither "appreciated" the "nature of his financial transactions" nor "the quality -- soundness, profitability or likelihood of success."  Final Brief at 44.  The question before the members was much broader and encompassed all charges, i.e., whether at the time of the offenses, appellant was delusional and unable to comprehend that he was borrowing money with forged promissory notes; receiving money for performing legal services that he was not authorized to perform; collecting money for fraudulent investment schemes; writing worthless checks; and making a threat.

As recounted above, the evidence before the members consisted of conflicting testimony by expert witnesses concerning the severity of appellant's bipolar disorder. The main controversy centered on the extent that appellant suffered acute, manic episodes, as opposed to lower level hypomanic episodes over the course of the approximately twenty-eight months during which the charged offenses

occurred. There was no consensus of opinion as to whether appellant was psychotic, i.e., that he suffered a complete break between reality and fantasy, or that he was delusional at any point in time, and even less agreement that appellant was psychotic over the entire twenty-eight-month time frame.

The defense experts who evaluated and treated appellant were of the view that appellant's disorder was more severe than the government expert witnesses believed. The government experts looked to the testimony of the numerous victim-witnesses and other lay witnesses for evidence of the severity of appellant's disorder at the time of each offense.

In addition to the testimony of expert witnesses, the members had the benefit of assessing the statements and the testimony of numerous lay witnesses, including appellant's victims, as well as his friends and relatives. The members are entitled to consider the testimony of both expert and lay witnesses in their deliberations. See United States v. DuBose, 47 MJ 386, 389 (1998)(all relevant evidence must be considered; "There is no premium placed upon lay opinion as opposed to expert opinion, nor on 'objective' as opposed to 'subjective' evidence.").

This testimony established that there were numerous instances where appellant attempted to conceal his acts. Appellant asked that checks be made out to someone else for work to be performed by him; he stated to another individual, "I cannot officially work for you."; he told another person that the reason a loan payment was not being made was because "finance made a mistake and stopped the wrong allotment"; and he moved to a separate location, closed the door, and said he was "not allowed to do this" before accepting $1,700 in cash for what should have been free military legal services. This testimony also included statements by appellant to his brother that he could "scam anybody," and a request by appellant that he should not tell anybody or he would lose his retirement.

## Conclusion

Based on these and other facts, the court below concluded "that appellant failed to carry his burden of proving, by clear and convincing evidence, that he lacked the ability to appreciate the nature and quality or the wrongfulness of his acts constituting any specific offense." 53 MJ at 749. Applying the "reasonableness" standard of review, and interpreting the facts in the manner most favorable to the prevailing party below, we conclude that a reasonable jury could have found that

appellant failed to meet his burden of proving by clear and convincing evidence that he suffered a complete break between reality and fantasy, or was unable to appreciate either the nature and quality of his acts or the wrongfulness of his acts, on either a legal or moral plane.

We also conclude that because the Court of Criminal Appeals conducted a de novo review of appellant's finding of guilt, and determined that the members' finding of fact on mental responsibility was correct in law and fact, that appellant has received the benefit of appellate review at least as vigorous as the more deferential standard of review articulated in this opinion applicable to jury findings of fact on mental responsibility.  Therefore, further remand does not serve the best interests of justice.

Accordingly, we hold that appellant failed to prove his affirmative defense of lack of mental responsibility.

### Issue II

Appellant also asserts that "[p]roof of lack of mental responsibility during the period of the charged offenses meets the statutory requirement of proof of lack of mental responsibility at the time of the criminal act, if the time of the act falls within the period of lack of mental responsibility."  Final Brief at 47.  Appellant asserts

that the Army Court placed an "arbitrary, overly restrictive" burden on appellant by requiring him "to prove that at a particular moment of a charged offense, over a two and a half year period of time, on more than one hundred and ten separate occasions, two years after the fact, that he lacked mental responsibility."  Id. at 43-44.

We agree with appellant that the large number of charged offenses (seventy-nine) and the lengthy time frame over which the offenses occurred (two-and-a-half years) complicated the exigencies of proving this affirmative defense.  Dr. Bowen testified that "there was simply no way" to link descriptions of periods with every incident for which appellant was charged.  Under the facts of this case, and in light of the Government's concession that appellant suffered from a severe mental disease or defect during the entire time span of appellant's offenses, appellant argued at trial that he could not "appreciate" the "nature and quality" or the "wrongfulness" of his acts (the second prong of the mental responsibility analysis) during the entire period the offenses were committed, rather than at specific moments within this same time span.

The Government sought to rebut appellant's "all or nothing" argument by presenting evidence that appellant was able to "appreciate" the "nature and quality" or the

"wrongfulness" of his acts at least during specific times within the overall time frame. Specifically, the Government pointed to instances where appellant attempted to conceal his crimes, arguing that such actions demonstrated that appellant understood the "wrongfulness" and nature and quality of his acts.

We agree with appellant that such an all-or-nothing defense can be legally and logically relevant in proving that an accused did not appreciate the nature and quality or wrongfulness of his actions at the time of an offense. This is not to say that the members were required to accept appellant's all-or-nothing strategy in this case, in light of the Government's rebuttal. The military judge fully instructed the members on the elements of each offense and on their responsibility to consider each charge separately. It was up to the members to determine whether the affirmative defense of mental responsibility applied to all, some, or none of the charged offenses.

A similar scenario was addressed succinctly by a New York intermediate appellate court:

> The implicit premise of defendant's principal argument on appeal is that, in a case involving multiple related crimes, if an affirmative defense is established with respect to one crime, it necessarily must be established with respect to all crimes during a specific time period. Defendant cites no authority for that

41

proposition.  There may be instances involving affirmative defenses, other than insanity, (e.g., entrapment, duress, renunciation) in which a defendant may establish the defense with respect to some but not all of the related crimes charged.  For example, a defendant charged with multiple robberies or burglaries may be found to have acted under duress with respect to some but not all of the crimes.  Similarly, a defendant charged with multiple drug offenses may be found to have been entrapped by the police with respect to some but not all of the offenses.  Defendant cites no reason why the affirmative defense of insanity is not equally susceptible of partial, rather than total, success or failure.  <u>Although both the prosecutor and defense counsel may have tried the case on the all or nothing theory that defendant was either sane or insane throughout the period in question, the jury was not obligated to accept that assumption and, on the contrary, was entitled to reject it when the court repeatedly charged the jury to consider each charge separately.</u>

<u>People v. Justice</u>, 173 A.D.2d 144, 147-48 (N.Y.S.2d 1991) (emphasis added).

Based on the facts of this case, we hold that a reasonable jury could have found that appellant failed to carry his burden of proof by clear and convincing evidence that he was not mentally responsible throughout the period in question, and therefore at the time of each offense, in light of the Government's evidence in rebuttal that he did at times appreciate the nature and quality or wrongfulness of his acts during the time period in question.

42

## Decision

The decision of the United States Army Court of Criminal Appeals is affirmed.