# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39310**

————————————

**UNITED STATES**
*Appellee*

v.

**Chase J. EASTERLY**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 12 April 2019

————————————

*Military Judge:* Charles E. Wiedie, Jr.

*Approved sentence:* Dishonorable discharge, confinement for 7 years, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 25 April 2017 by GCM convened at Joint Base Pearl Harbor-Hickam, Hawaii.

*For Appellant:* Major Todd M. Swensen, USAF.

*For Appellee:* Lieutenant Colonel Joseph J. Kubler, USAF; Captain Michael T. Bunnell, USAF; Captain Sean J. Sullivan, USAF; Mary Ellen Payne, Esquire.

Before HUYGEN, MINK, and POSCH, *Appellate Military Judges*.

Senior Judge HUYGEN delivered the opinion of the court, in which Judge MINK joined. Judge POSCH filed a separate opinion concurring in the result in part and dissenting in part.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4.**

————————————

HUYGEN, Senior Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of attempted premeditated murder in violation of Article 80, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 880.[1,2] The members adjudged a sentence of a dishonorable discharge, confinement for seven years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the sentence as adjudged.

Appellant asserts six assignments of error: (1) whether the military judge abused his discretion by admitting Appellant's confidential communications with a psychotherapist;[3] (2) whether the military judge abused his discretion by admitting statements Appellant made in the presence of his first sergeant without being advised of his rights under Article 31, UCMJ, 10 U.S.C. § 831; (3)–(5) whether the conviction of attempted premeditated murder was legally and factually insufficient because the Government failed to prove specific intent and substantial step and because Appellant abandoned his effort to commit murder; and (6) whether, at the time of the offense, Appellant lacked the mental responsibility to commit the offense. We also specified the issue of whether the military judge committed plain error by failing to instruct *sua sponte* on the impact of a punitive discharge on permanent retirement for physical disability, and we considered the issue of timely appellate review. We find prejudicial error with regard to the military judge's failure to instruct the court members on the impact of a punitive discharge on retirement. Thus, we affirm the findings but set aside the sentence.

## I. BACKGROUND

In September 2015, Appellant was deployed to southwest Asia. While there, he had homicidal thoughts, which worried him. He told his deployed

---

[1] The members found Appellant not guilty of communicating a threat in violation of Article 134, UCMJ, 10 U.S.C. § 934. A charge for fraudulent enlistment in violation of Article 83, UCMJ, 10 U.S.C. § 883, was withdrawn and dismissed after arraignment.

[2] All references in this opinion to the UCMJ, Rules for Courts-Martial, and Military Rules of Evidence are to the UCMJ and rules found in the *Manual for Courts-Martial, United States* (2016 ed.) (*MCM*).

[3] The trial transcript, exhibits, and briefs addressing the first assignment of error were sealed pursuant to Rule for Courts-Martial (R.C.M.) 1103A. These portions of the record and briefs remain sealed, and any discussion of sealed material in this opinion is limited to that which is necessary for our analysis. *See* R.C.M. 1103A(b)(4).

first sergeant about these thoughts, and, as a result, he was medically evacuated to Landstuhl Regional Medical Center (Landstuhl), Germany and, after a couple of weeks of treatment, to Travis Air Force Base, California. While at Landstuhl, Appellant received his first diagnosis of schizophrenia.

In October 2015, when Appellant reached his home station of Joint Base Pearl Harbor-Hickam, Hawaii, he began treatment consisting of prescribed medication and regular (usually weekly) sessions with a psychologist, Major (Maj) ER. Maj ER confirmed the diagnosis of schizophrenia, which triggered the process to evaluate Appellant for a discharge based on disability.

On 26 April 2016, an Informal Physical Evaluation Board (IPEB) confirmed a specific diagnosis of "Schizophrenia Spectrum, Persistent Auditory Hallucinations" and found Appellant unfit for military service. However, the IPEB also found that Appellant's condition existed prior to military service and was not permanently aggravated by military service. The IPEB concluded that Appellant should be discharged with no compensable disability, despite his "significant risk of recurrence and/or progression of his disease" and need for "frequent follow-up with a medical specialist."

In May 2016, the victim of Appellant's offense, EE, met Appellant through a dating website. At the time, EE was approximately 60 years old and Appellant was 22. EE testified at trial and recounted the following: Their first date was a dinner on Monday, 23 May 2016. EE described Appellant as "charming" and "a Jimmy Stewart sort of nice." After dinner, they drove in Appellant's car to the beach. EE was cold and wanted Appellant to put his arm around her. He declined to do so, at which point EE wanted to go home. They drove back to the restaurant. Appellant asked for a goodnight kiss, but EE spurned him because he smelled like cigar smoke. On Tuesday night, they went country dancing, and EE described Appellant as "a complete gentleman." Appellant asked EE to go out with him on Wednesday, but she said no.

That Friday, 27 May 2016, EE and Appellant went on their third date, which was planned as a dinner and a nighttime hike. When Appellant showed up in casual clothes, EE was disappointed because "the first night I was with Jimmy Stewart, the second night I was with like John Wayne, and then there's this guy that looks like he's going to fix his car," an impression that turned out to be prophetic. On the way to dinner, Appellant's car broke down, and EE pushed it into the restaurant parking lot while he steered. His previously mild stutter became "thick" as he was making phone calls to arrange a tow. After dinner, they took a taxi to EE's apartment so that she could drive Appellant back to base. When they were about to get into her car, he asked to use her bathroom and added that he could check what tools he would need the next day to hang a mirror she had asked him to hang. Once in her apartment, she pointed him toward the guest bathroom but, shortly af-

terwards, found him in her bathroom. She told him to get out of her bathroom, which she did not like guests to use, and he went into her bedroom and sat on her bed. After they argued about a news story being reported on television, Appellant was "very apologetic," asked EE to let him "relax" her, and offered to perform oral sex on her. She initially declined but then acquiesced. According to EE, the oral sex was not "something that he was wanting to do or skilled at." She stopped Appellant by sitting up "like the Exorcist" and yelling, "I hope someone's having fun because I'm not." Her outburst saddened Appellant, who struggled to say that he wanted to take a short walk. EE said, "why don't you take a long walk," and Appellant left the apartment.

EE expected Appellant to return the next day, Saturday, 28 May 2016, to hang a mirror and build an armoire for her. She called him repeatedly and left voicemail messages, the last one ending with her calling him a "coward." He did not return her calls or otherwise respond.

On the afternoon of Sunday, 29 May 2016, EE heard a knock on her apartment door. She was not expecting anyone, assumed there was a delivery, and decided not to answer. She then heard Appellant say her name and apologize repeatedly; she did not respond. After 10 to 15 minutes had passed, Appellant called out to EE's roommate, who was not at home, and said that he was there to retrieve his wallet. EE did not want to talk with Appellant, so she stayed out of Appellant's view but watched through a window as Appellant took "another look around" and left.

In a videotaped interview by Air Force Office of Special Investigations (AFOSI) agents that was presented at trial, Appellant described his actions of the weekend as follows: on 27 May 2016, Appellant was at EE's apartment when "my body went like numb . . . . I just stared at a wall for a good like five, 10 minutes. And then I told her I wanted to go for a walk." He left the apartment and took a taxi back to base.

On 28 May 2016, Appellant had "the urge to want to hurt [EE]" and thought, "I don't want to do this but I can't stop myself." He went to the Base Exchange and bought a knife, lighter, and lighter fluid. He gathered a bag of "items," including the knife, lighter, and lighter fluid, trash bags, gloves, extra clothes, bleach, and a dust mask. He planned to make sure he would not get "caught" by using the bleach "for DNA," specifically, to remove his DNA from the knife and EE's apartment, the gloves "for no [finger]prints," and the lighter and lighter fluid to start a fire in EE's apartment, as he had learned to do by watching television shows.

On 29 May 2016, Appellant borrowed another Airman's car and drove to EE's apartment complex. He parked a few blocks away and claimed that he avoided the security cameras around the complex as he approached EE's

building. Once inside, he followed another resident on to the elevator and arrived at EE's apartment. Standing with his hands at his sides and his bag at his feet, he knocked on her door, waited 5 to 10 minutes, and then knocked again. While he was nervous, he also felt "a power of like strength almost, feels like a thrill ride." But as he stood at her door for a total of approximately 20 minutes, "my brain clicked, like went back to normal me. And I realized what I had done." He further explained to AFOSI, "thank God she wasn't home. . . . 'Cause otherwise I may have done it. . . . I might have actually harmed her in some way. I don't think I actually would have . . . killed her, but I'm sure I might have tried actually harm[ing her]." He initially remembered leaving the building and throwing his bag into a dumpster but then recalled taking it out of the dumpster and back to his dormitory room. Although Appellant told AFOSI that, "the day after," he spoke with a chaplain and then went with the chaplain to see Maj ER, he actually spoke with a chaplain three days later and went by himself to see Maj ER.

Monday, 30 May 2016, was a federal holiday. On Wednesday, 1 June 2016, Appellant talked with a military chaplain, who referred Appellant to Maj ER, the psychologist who had been treating him since October 2015. Appellant—of his own volition and by himself—went to see Maj ER. Events unfolded as described below, and the day ended with Appellant voluntarily admitted for in-patient treatment at the Behavioral Health Unit of Tripler Army Medical Center (TAMC), Hawaii.

On the following Monday, 6 June 2016, Appellant's first sergeant, Master Sergeant (MSgt) JM, became the first person to contact AFOSI about Appellant. On 7 June 2016, AFOSI agents executed a search authorization and seized from Appellant's dormitory room a black bag that contained various items, including a bottle of bleach, a multipurpose lighter, a bottle of lighter fluid, a face dust mask, an eight-inch knife in a sheath, a trash bag, shorts, and a t-shirt. Documents and security camera video footage from the Base Exchange indicated that Appellant bought the knife and, in a separate transaction, the lighter and lighter fluid on 28 May 2016. Security camera video footage from EE's apartment complex showed Appellant, wearing a suit and carrying a black bag, as he walked to and waited for the elevator in EE's apartment building on 29 May 2016. On 8 June 2016, AFOSI agents interviewed Appellant while he was still an in-patient at TAMC.

Meanwhile, the PEB process continued. On 21 June 2016, a Formal Physical Evaluation Board (FPEB) determined that Appellant "has a chronic disease [schizophrenia] that has no cure and is characterized by unpredictable exacerbations and remissions. Clinical notes state that [Appellant] will require lifelong treatments." Overriding the earlier finding of the IPEB, the FPEB found that Appellant's condition was permanently aggravated by mili-

tary service. As a result, the FPEB recommended "Permanent Retirement" with a disability rating of 100 percent.

Also on 21 June 2016, Appellant was released from in-patient treatment at TAMC and ordered into pretrial confinement, where he remained until he was sentenced on 25 April 2017.

## II. DISCUSSION

### A. Psychotherapist–Patient Privilege

Appellant first asserts that the military judge abused his discretion by admitting Appellant's confidential communications with a psychotherapist, which were made to facilitate mental health treatment. We disagree.

#### 1. Additional Background

During a motions hearing, Maj ER described a meeting with Appellant on 1 June 2016 when Appellant told her that he was worried he might hurt someone. He explained that, a couple days earlier, a woman with whom he had a brief sexual relationship "stood him up." He then obtained items to kill her and went to her home, but she was not there. While he was not planning to try again, he was scared about the possibility that he might. When Maj ER asked Appellant if he was willing to be admitted for in-patient mental health treatment, he indicated that he was.

Maj ER notified Appellant's chain of command, specifically, his first sergeant, MSgt JM, that Appellant posed a potential danger to other people. Maj ER considered her notice to be an exception to the psychotherapist–patient privilege. Maj ER relayed to MSgt JM that Appellant had planned to murder a woman with whom he had a brief sexual relationship; that he bought certain items to kill her; and that he went to her apartment and knocked on her door but she was not at home. Appellant identified EE only by her first name and did not provide her telephone number or address. In notifying Appellant's unit and providing details about what Appellant had told Maj ER, Maj ER was trying to convey the gravity of the situation and to differentiate it from previous incidents when Appellant had told her about homicidal thoughts he was having. Although Appellant had previously described having such thoughts to Maj ER, he had never before described planning or taking any action to commit murder.

After Maj ER spoke with MSgt JM, she provided the same information about what Appellant had told her in two telephone calls to TAMC, first to the Emergency Room attending physician and second to the Behavioral Health Unit attending psychiatrist. Maj ER did so intending for Appellant to be evaluated at the Emergency Room and then admitted for in-patient hospi-

talization at the Behavioral Health Unit. She also expected that, if there was a "duty to warn," TAMC would handle it.

Maj ER "handed off" Appellant to MSgt JM, and MSgt JM escorted Appellant to TAMC. Maj ER expected MSgt JM to stay with Appellant until he was admitted or to contact her if he was not. Although Maj ER was supporting Appellant's decision to seek voluntary admission for in-patient treatment at TAMC, she was fully prepared to take the necessary steps to have him admitted involuntarily if he changed his mind.

At Appellant's court-martial, the Defense moved to suppress Appellant's statements to Maj ER and derivative evidence pursuant to Mil. R. Evid. 513. The military judge conducted a closed hearing and denied the motion based on the exceptions articulated in Mil. R. Evid. 513(d)(4) and Mil. R. Evid. 513(d)(6). The military judge also determined that Maj ER did not disclose more information than necessary.

**2. Law**

"We review a military judge's decision to admit or exclude evidence for an abuse of discretion." *United States v. Jenkins*, 63 M.J. 426, 428 (C.A.A.F. 2006) (citing *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000)). "We will reverse for an abuse of discretion if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law." *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004) (quoting *United States v. Sullivan*, 42 M.J. 360, 363 (C.A.A.F. 1995)). "[A] judge has a range of choices and will not be reversed so long as the decision remains within that range." *Id.* (citing *United States v. Wallace*, 964 F.2d 1214, 1217 n.3 (D.C. Cir. 1992)).

Mil. R. Evid. 513(a) states the general rule for the psychotherapist–patient privilege and provides that a patient has a privilege to refuse to disclose and to prevent anyone else from disclosing a confidential communication made to a psychotherapist for the purpose of facilitating diagnosis or treatment. "Psychotherapist" includes a clinical psychologist or other mental health professional. Mil. R. Evid. 513(b)(2). A "confidential" communication is "not intended to be disclosed to third persons other than those to whom disclosure is in furtherance of the rendition of professional services." Mil. R. Evid. 513(b)(4).

Mil. R. Evid. 513(d) describes seven exceptions to the psychotherapist–patient privilege. The two relevant to Appellant's case are when a psychotherapist "believes that a patient's mental or emotional condition makes the patient a danger to any person," Mil. R. Evid. 513(d)(4), and when disclosure is "necessary to ensure the safety and security of military personnel, military

dependents, military property, classified information, or the accomplishment of a military mission," Mil. R. Evid. 513(d)(6).

### 3. Analysis

The record in Appellant's case, which includes the military judge's written ruling denying the Defense's motion to suppress Appellant's statements to Maj ER, makes clear that those statements qualified under Mil. R. Evid. 513 as confidential communications subject to the psychotherapist–patient privilege. Appellant made the statements to Maj ER as his treating psychologist for the purpose of facilitating mental health treatment, or, as Appellant put it when explaining to AFOSI how he came to be admitted at TAMC, "I went straight [to Maj ER], said I need the help."

Had Appellant not told Maj ER about his attempt to kill EE, the Government, particularly AFOSI or any law enforcement agency, would never have known of Appellant's crime. The Airman whose car Appellant drove to EE's apartment on Sunday and who Appellant asked to sharpen his newly purchased knife on Saturday had no idea of what Appellant intended; EE did not—and had no reason to—suspect that Appellant presented a threat when she saw him at her door on Sunday; and the chaplain who referred Appellant to Maj ER let him make the decision to go and let him go unescorted. But because of what Appellant told Maj ER, she notified MSgt JM and providers at TAMC; MSgt JM escorted Appellant to TAMC and was present during Appellant's medical examination; and MSgt JM connected what he saw in Appellant's dormitory room—the black bag and its contents—to what Maj ER had disclosed to MSgt JM and what Appellant had said when being admitted to TAMC about Appellant's plan to commit murder. As a result, MSgt JM contacted AFOSI; AFOSI seized the bag and interviewed Appellant; and Appellant provided the details of what he had done.

Appellant now contends that the military judge abused his discretion by not suppressing the statements Appellant made to Maj ER and all of the fruit that sprang from that purportedly poisonous tree. We are not persuaded. The military judge issued a written denial of the Defense's motion to suppress, which laid out his bases and reasoning with more than sufficient information to leave us with a definite and firm conviction that the military judge did not commit any error, much less abuse his discretion. In the denial, the military judge addressed the three concerns Appellant raised at trial and raises again on appeal, and we find in the military judge's determinations neither a clearly erroneous finding of fact nor an erroneous view of the law.

First, Appellant points to Maj ER's testimony that, at the time Appellant made the confidential communications, he "did not have an active plan [to kill EE] or intention to go out and do it again." Appellant argues that the Mil.

R. Evid. 513(d)(4) exception requires a "present" danger and that, when he went to see Maj ER, more than two days had passed since his attempt to kill EE and he did not want to hurt anyone at that time. We agree with Appellant's reading of Mil. R. Evid. 513(d)(4) to require a "present" danger insofar as a strictly "past" danger would be insufficient to trigger the exception. For example, Appellant's homicidal thoughts before his September 2015 medical evacuation would not have allowed Maj ER to disclose his confidential communications to her in May 2016.

However, we disagree with Appellant's reading insofar as he would have "present" mean "at that exact moment." As the military judge explained, Maj ER disclosed Appellant's confidential communications because she believed he was a "present" danger. While Maj ER played her part in Appellant's voluntary admission for in-patient treatment at TAMC, she was fully prepared to have him admitted involuntarily. No more than Maj ER and the military judge, we cannot ignore the fact that Appellant went to see Maj ER on 1 June 2016 not only because he had planned and attempted to kill EE the weekend before but also because he was scared he might try again. That Maj ER believed Appellant was a danger to anyone and thus the Mil. R. Evid. 513(d)(4) exception applied was a fact-specific determination for the military judge that we decline to override. *See Jenkins*, 63 M.J. at 430–31 (holding that "[w]hether the exceptions [to Mil. R. Evid. 513] apply is necessarily a fact-specific determination for a military judge to consider with an accurate awareness of the facts underlying the dispute" and that the military judge properly applied Mil. R. Evid. 513(d)(4) and (6) where the appellant made a verbal threat while "brandishing" a knife and, two days later, made the confidential communications at issue on appeal).

Second, Appellant asserts that the Mil. R. Evid. 513(d)(6) exception did not apply because EE was a civilian and therefore he did not endanger the safety and security of himself or other military personnel, military dependents, military property, or a military mission. However, the military judge explained that he applied the exception specifically because of Appellant's military status:

> [Appellant] is a military member assigned to a military unit. While he remains a member of that military unit, he has a role to play in the accomplishment of the mission. His fitness for duty has a direct impact on his ability to perform his Air Force function. . . . [T]here was a real and immediate concern about his fitness for duty.

As with the Mil. R. Evid. 513(d)(4) exception, the application of the Mil. R. Evid. 513(d)(6) exception was a fact-specific determination for the military judge that we leave undisturbed.

Third, Appellant claims that Maj ER disclosed more privileged information than was necessary to have Appellant admitted at TAMC and therefore more than was necessary to ameliorate the danger Appellant presented or to ensure military safety and security. To support this claim, Appellant relies on Air Force Instruction 44–172, *Mental Health*, ¶ 6.6.2 (13 Nov. 2015), which directs mental health practitioners to "provide the minimum amount of information to satisfy the purpose of the disclosure." The military judge resolved the issue to our satisfaction by finding that the attempt to kill EE "was very different in [Maj ER's] mind" from the previous incidents when Appellant experienced homicidal thoughts; his "unit needed to understand how this situation was different"; and "this was best accomplished by explaining what [Appellant] had done that made it different." Thus, the military judge's decision to deny the Defense's motion to suppress Appellant's statements to Maj ER was well within the range of choices available to him, rested on neither a clearly erroneous finding of fact nor an erroneous view of the law, and did not constitute an abuse of discretion.

## B. Article 31, UCMJ, Rights Advisement

Appellant next avers that the military judge abused his discretion by admitting statements Appellant made while seeking medical treatment and in the presence of his first sergeant, MSgt JM, without being advised of his rights under Article 31, UCMJ. We are not convinced.

### 1. Additional Background

On 1 June 2016, Maj ER "handed off" Appellant to MSgt JM. During a motions hearing, MSgt JM described what happened next: Appellant and MSgt JM first drove separately to Appellant's dormitory, where Appellant parked his car and changed clothes. Appellant then rode with MSgt JM to the TAMC Emergency Room.

At the Emergency Room, Appellant, accompanied by MSgt JM, checked in at the front desk and, after a brief wait, was shown to an examination room where his vital signs were checked and a blood sample taken. Still accompanied by MSgt JM, Appellant was shown to another examination room. As described by MSgt JM, a woman—identified later in the record as a nurse—came into the room and asked Appellant questions such as "was he feeling anything on his skin, hearing any voices, seeing any visions, stuff like that." She did not ask and Appellant did not offer why Appellant was at TAMC. After the woman left, a man—identified later as the Emergency Room attending physician, Dr. RD—came in and asked Appellant several questions, including why he was there. MSgt JM remembered Appellant telling Dr. RD that Appellant bought everything he needed "to commit the perfect murder" and that he did not go through with it because "she wasn't home." After addi-

tional questions and answers, Dr. RD left. Another man who MSgt JM described as a "doctor" and was the Behavioral Health Unit attending psychiatrist[4] entered the room, had MSgt JM step out, and asked MSgt JM what was happening with Appellant. After the doctor and MSgt JM spoke, the doctor told MSgt JM that he would be with Appellant for an hour to an hour and a half and that MSgt JM could leave during that time. After an hour had passed, MSgt JM returned and waited outside the examination room. The doctor came out and informed MSgt JM that Appellant had voluntarily "agreed to be admitted to the Behavioral Health Unit."

When Dr. RD, the Emergency Room attending physician, examined Appellant, MSgt JM was present. According to Dr. RD, it is "typical" for "command members" to be present during an examination of a military-member patient if the patient is "brought in by command." Furthermore, Dr. RD does not have "command" leave unless the patient so requests.[5] The purpose of Dr. RD's examination is to determine if the patient is "medically cleared" for admission to the Behavioral Health Unit. If Dr. RD decides that "nothing else needs to be done from a medical standpoint," a psychiatrist conducts an evaluation and decides whether to admit the patient.

Dr. RD began Appellant's examination by asking what had brought Appellant to the Emergency Room. According to Dr. RD's notes, Appellant said that he had "gotten the idea in his head to . . . go and kill a girl. . . . He got his materials. . . . Went to her home. She wasn't home and he said he panicked and realized he would have killed her."

After Appellant was admitted on Wednesday, 1 June 2016, MSgt JM next saw Appellant when he visited Appellant on Friday, 3 June 2016. Appellant asked him if he could bring Appellant a uniform and toiletries from Appellant's dormitory room, which he agreed to do on Monday, 6 June 2016. When MSgt JM went to Appellant's dormitory room that Monday, he first looked for a bag to carry everything. He saw an unzipped black bag, opened it, saw items that he assumed Appellant referenced as the items Appellant bought "to commit the perfect murder," including trash bags, bleach, black shorts, and a dust mask, and closed the bag. After collecting the things he had come

---

[4] There is no definitive by-name identification of the "doctor" in the record.

[5] Dr. RD described his interactions with patients as "privileged" but, when questioned, clarified that he was referring to "physician-patient confidentiality" and protections for health information that he guessed would fall under the Health Insurance Portability and Accountability Act (HIPAA). He was not referring to any privilege for psychiatry or mental health treatment or diagnosis.

for and putting them in another bag, MSgt JM looked in the first bag again "to make sure I saw what I thought I saw," left the first bag in the room, departed the room, and contacted AFOSI that same day.

On 7 June 2016, AFOSI agents executed a search authorization and seized from Appellant's dormitory room the black bag that MSgt JM had looked in the day before. On 8 June 2016, AFOSI agents interviewed Appellant while he was still an in-patient at TAMC. Before asking Appellant about the events of 28–29 May 2016, one of the agents advised Appellant of his rights under Article 31, UCMJ. After asking a few questions and acknowledging his understanding of his rights, Appellant waived them.

At Appellant's court-martial, the Defense moved to suppress his statements to Maj ER and TAMC personnel, including those statements made in the presence of MSgt JM, and derivative evidence pursuant to Article 31, UCMJ, and the Fifth Amendment to the United States Constitution, U.S. CONST. amend. V. The military judge conducted a hearing and denied the motion because there was no requirement to advise Appellant of his Article 31, UCMJ, rights, including the right against self-incrimination, before he made the statements at issue.[6]

### 2. Law

The standard of review of a military judge's decision to admit or exclude evidence for an abuse of discretion is as stated above. "When there is a motion to suppress a statement on the ground that rights' warnings were not given, we review the military judge's findings of fact on a clearly-erroneous standard, and we review conclusions of law *de novo*." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000) (citing *United States v. Ayala*, 43 M.J. 296, 298 (C.A.A.F. 1995)) (additional citation omitted).

Article 31(a), UCMJ, articulates a military member's right against self-incrimination. 10 U.S.C. § 831(a). Article 31(b), UCMJ, requires that a person subject to the UCMJ first inform a military member suspected of an offense of "the nature of the accusation" and advise the member of the right against self-incrimination before interrogating the member or asking for a statement. 10 U.S.C. § 831(b); *see also* Mil. R. Evid. 305(c)(1).

---

[6] Unlike during motions practice at trial, Appellant now limits his claim of an Article 31, UCMJ, rights violation to the statements Appellant made in the presence of MSgt JM while Appellant was seeking admission and treatment at TAMC. As a result, we do not address the applicability of Article 31, UCMJ, to the statements Appellant made to Maj ER and the Behavioral Health Unit attending provider, which statements were made outside of MSgt JM's presence.

### 3. Analysis

The only self-incriminating statements Appellant made in MSgt JM's presence while Appellant was seeking medical treatment were the statements to Dr. RD, the TAMC Emergency Room attending physician. In particular, MSgt JM recalled Appellant telling Dr. RD that Appellant bought items "to commit the perfect murder." MSgt JM thought he saw those items when he opened a bag in Appellant's dormitory room and then contacted AFOSI.

The Article 31, UCMJ, issue raised by Appellant is a two-part question of first whether Dr. RD was required to advise Appellant of his rights and second whether MSgt JM was required to do so. The military judge answered both parts in the negative, as do we.

In the military judge's written denial of the Defense's motion to suppress the statements made to medical personnel in MSgt JM's presence, the judge cited, *inter alia*, *United States v. Loukas*, 29 M.J. 385, 387 (C.M.A. 1990), for the general proposition that Article 31(b), UCMJ, applies if a military member is questioned by someone acting in a law enforcement or disciplinary capacity. *See also United States v. Cohen*, 63 M.J. 45, 49–50 (C.A.A.F. 2006). We find no error with the military judge's determination that Dr. RD and MSgt JM were not acting in such a capacity and therefore neither was required to advise Appellant of his Article 31, UCMJ, rights. *See also United States v. Moses*, 45 M.J. 132, 134–35 (C.A.A.F. 1996) ("[I]n *United States v. Fisher*, 21 U.S.C.M.A. 223, 44 C.M.R. 277 (1972), this Court held that a military doctor was not required to give Article 31(b) warnings before asking questions for the purpose of diagnosing a patient."). We further note, as did the military judge, that MSgt JM did not interrogate Appellant or ask him for a statement about his offense, did not use the medical process or medical personnel to circumvent Article 31, UCMJ, and was present during Dr. RD's medical examination to ensure Appellant's health and safety by ensuring he was admitted for in-patient treatment. Accordingly, we find that the military judge did not abuse his discretion by admitting the statements Appellant made to Dr. RD in the presence of MSgt JM without Appellant being advised of Appellant's Article 31, UCMJ, rights.

## C. Legal and Factual Sufficiency

Appellant challenges the legal and factual sufficiency of his conviction of attempted premeditated murder in three respects: (1) the Government failed to prove specific intent; (2) the Government failed to prove substantial step; and (3) Appellant abandoned his effort to commit murder. We conclude that Appellant's conviction is legally and factually sufficient.

### 1. Additional Background

The evidence at trial indicated that the romantic relationship developing between Appellant and EE came to an abrupt end with an awkward sexual encounter on 27 May 2016. On 28 May 2016, while EE was leaving angry voicemail messages, Appellant bought an eight-inch knife, lighter fluid, and a lighter. On 29 May 2016, he drove to EE's apartment and twice knocked on her door with a bag at his feet containing the knife, lighter fluid, and lighter as well as a bottle of bleach, face dust mask, trash bags, shorts, and a t-shirt. After he waited for 20 or so minutes, he left.

When interviewed by AFOSI on 8 June 2016, Appellant made several, seemingly inconsistent statements. He described his state of mind during the events of 28–29 May 2016 as "I still knew what I was doing somewhat, but my brain, like I could not stop myself from doing things." He also claimed that he "actually didn't want to do anything. So as far as I know I didn't actually like actually do anything wrong. But you know I did have the thoughts that I did want to do something but [I] wasn't in my right mind at the time." Appellant admitted, "[The] only other time I've actually felt like I had actual thoughts of wanting to harm someone was when I was deployed." Comparing the deployed incident to the charged incident, Appellant described the former as "I only had thoughts. I never took any sort of action at all. . . . I wasn't even close to . . . wanting to harm someone or anything like that 'cause I stopped myself so soon. This time I had [no] chance to stop myself."

While Appellant conceded that "[i]f she were home I'm pretty sure I would've harmed her in some way," he found it significant that he wore "a thousand dollar suit" to EE's apartment:

> I wouldn't want to mess that up . . . with blood or anything. I think that's like another small part of me that was like . . . you're not [going] to do this . . . 'cause why would I wear a thousand dollar suit to do that. That doesn't even make sense.

Furthermore, when Appellant "realized what [he] was doing," he "went home" and "never went back again," a fact he thought important because "I'm sure if I really wanted to do it I would've gone back again to her house, which I never did." Yet, he also told AFOSI, "thank God she wasn't home. . . . [O]therwise I may have done it. . . . I might have actually harmed her in some way. I don't think I actually would have . . . killed her, but I'm sure I might have tried actually harm[ing her]."

### 2. Law

We review issues of legal and factual sufficiency de novo. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citation omitted). Our assessment of legal and factual suffi-

ciency is limited to the evidence produced at trial. *United States v. Dykes*, 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted). The test for legal sufficiency of the evidence is "whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted).

The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt." *Turner*, 25 M.J. at 325. "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington*, 57 M.J. at 399), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). The term "beyond a reasonable doubt" does "not mean that the evidence must be free from conflict." *Id.* (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)).

In order for Appellant to be found guilty of attempted premeditated murder under Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt that (1) Appellant did a certain overt act, that is, went to the residence of EE with a knife and other items, purposely avoided security cameras, snuck on to the elevator, and knocked on her door; (2) the act was done with the specific intent to commit premeditated murder; (3) the act amounted to more than mere preparation; and (4) the act apparently tended to effect the commission of the intended premeditated murder. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b.

An attempt requires more than preparation; it requires an overt act.

> The overt act required . . . is a direct movement toward the commission of the offense. . . . The overt act need not be the last act essential to the consummation of the offense. For example, an accused could commit an overt act, and then voluntarily decide not to go through with the intended offense. An attempt would nevertheless have been committed, for the combination of a specific intent to commit an offense, plus the commission of an overt act directly tending to accomplish it, constitutes the offense of attempt.

*Id.* ¶ 4.c.(2).

Although failure to complete the offense is not a defense, voluntary abandonment is. *Id.* ¶ 4.c.(2), (4).

> It is a defense to an attempt offense that the person voluntarily and completely abandoned the intended crime, solely because of the person's own sense that it was wrong, prior to the completion of the crime. The voluntary abandonment defense is not allowed if the abandonment results, in whole or in part, from other reasons, for example, the person . . . decided to await a better opportunity for success, was unable to complete the crime, or encountered unanticipated difficulties . . . .

*Id.* ¶ 4.c.(4).

The elements of premeditated murder under Article 118, UCMJ, 10 U.S.C. § 918, are (1) that a certain person is dead; (2) that the death resulted from an act or omission of the accused; (3) that the killing was unlawful; and (4) that, at the time of the killing, the accused had a premeditated design to kill. *Id.* ¶ 43.b.(1). Premeditated murder is explained as "murder committed after the formation of a specific intent to kill someone and consideration of the act intended." *Id.* ¶ 43.c.(2)(a). "The existence of premeditation may be inferred from the circumstances." *Id.*

### 3. Specific Intent

Appellant's contention that the Government failed to prove his specific intent to kill EE relies on his ambivalent statements to AFOSI, such as "I might have actually harmed her in some way. I don't think I actually would have actually gone through [with it] and killed her," and the fact that, while standing at her apartment door, he never took the knife out of the bag. Conversely, the Government points to Appellant's statement that he "bought everything he needed to commit the perfect murder" and his plan to use those items to kill EE and evade detection by law enforcement: stab EE with a knife but wear gloves to avoid leaving his fingerprints at the scene of the crime, pour bleach on the knife and in the apartment to remove his DNA, change from bloody clothes to clean ones, and light the apartment on fire to destroy the evidence. The Government's argument rests on the legal premise that the intent to commit premeditated murder can be shown by direct or circumstantial evidence, *United States v. Davis*, 49 M.J. 79, 83 (C.A.A.F. 1998) (citation omitted), and the logical conclusion that, had Appellant intended only to harm EE, he would have needed only a means to do so and not everything "to commit the perfect murder."

We are persuaded by the Government's argument. While Appellant never explicitly stated that he intended to kill EE, such a statement was not neces-

sary for the Government to prove specific intent. *See id.* Furthermore, we find the evidence sufficient to determine Appellant's specific intent to kill EE despite his attempts to minimize the deadly nature of his actions during his AFOSI interview. He had developed a plan to "harm" EE and gathered particular items to cover up his crime of "harming" EE. But Appellant made no attempt to hide his identity from EE, the "harm" was to be done with a knife, and the cover-up involved setting the apartment on fire. The circumstantial evidence supports the logical conclusion that Appellant intended to kill EE by stabbing her to death, lest she survive any lesser harm and identify him as the perpetrator.

Considering the totality of the evidence, both direct and circumstantial, and drawing every reasonable inference from that evidence in favor of the prosecution, we are convinced that a reasonable factfinder could have found beyond a reasonable doubt all the essential elements of attempted premeditated murder, including that Appellant had the specific intent to commit the offense. Furthermore, we have weighed the evidence in the record of trial and made our own independent determination that the Government proved beyond a reasonable doubt each required element of the convicted offense, including Appellant's specific intent to kill EE as a premeditated act.

**4. Substantial Step**

Appellant asserts on appeal, as he did at trial, that the Government failed to prove that Appellant took a substantial step to committing premeditated murder and thus failed to prove that Appellant attempted the offense.[7] Appellant argues that his actions did not include taking out the knife, trying to break into EE's apartment, waiting for EE, or returning to the apartment and therefore amounted only to "mere preparation." We are instead persuaded by the Government's position and the actions Appellant did take: he bought a knife, borrowed a car, drove to EE's apartment, got on to the elevator without notifying her, and twice knocked on the door in a 20-minute time period during which he waited for her to answer with a bag at his feet that contained the knife to kill her and items to cover up the crime. These actions constitute a substantial step, or overt act.

Understanding that the overt act need not be the last act essential to committing the offense, *see MCM*, pt. IV, ¶ 4.c.(2), we determine that Appel-

---

[7] The Defense moved for a finding of not guilty pursuant to R.C.M. 917 "as there was insufficient evidence to establish a substantial step that tended to effectuate the commission of the murder of [EE] by knife." The military judge denied the motion, and Appellant does not now challenge that denial.

lant's overt act, particularly the last step of knocking, waiting, and knocking again, completed the attempt offense. *See United States v. Brooks*, 60 M.J. 495, 498–99 (C.A.A.F. 2005) (conviction for attempted carnal knowledge of a child under the age of 12 was found legally sufficient where the appellant brought a stuffed animal and other gifts suitable for a young child to a planned meeting with the purported eight-year-old girl and was apprehended at the door of the hotel room where the meeting was supposed to occur); *United States v. Schweitzer*, No. ACM 39212, 2018 CCA LEXIS 453, at *2–13 (A.F. Ct. Crim. App. 8 May 2018) (unpub. op.), *rev. denied*, 78 M.J. 110 (C.A.A.F. 2018) (conviction for attempted sexual assault of a child under the age of 16 was found legally and factually sufficient where the appellant bought condoms, put them in the glove box of his car, drove to the home of the purported 14-year-old girl, and knocked on the back door). As Appellant himself admitted, "thank God she wasn't home. . . . [O]therwise I may have done it." *See United States v. King*, 71 M.J. 50, 52 (C.A.A.F. 2012) (holding that the appellant's request for the victim to lift her shirt was an "overt act" sufficient to constitute attempt and that, but for her refusal to do so, the appellant would have committed the offense of indecent conduct). A reasonable factfinder could have found beyond a reasonable doubt that Appellant took a substantial step and therefore attempted to commit premeditated murder, and we are convinced beyond a reasonable doubt of the same.

### 5. Abandonment

The military judge instructed the court-martial panel members that the "defense of voluntary abandonment has been raised by the evidence." The military judge continued:

> If you're satisfied, beyond a reasonable doubt, of each of the elements of attempted premeditated murder . . . you may not find [Appellant] guilty . . . if, prior to the completion of [the offense], [Appellant] abandoned his effort to commit the offense, under circumstances manifest in a complete and voluntary renunciation of [Appellant]'s criminal purpose. . . . Renunciation of a criminal purpose is not voluntary if it is motivated, in whole or in part . . . by the inability to commit the crime. Renunciation is not complete if it is motivated by a decision to postpone the criminal conduct until a more advantageous time.

> The burden is on the prosecution to establish [Appellant]'s guilt, beyond a reasonable doubt. Consequently, unless you are satisfied, beyond a reasonable doubt, that [Appellant] did not completely and voluntarily abandon his criminal purpose, you may not find [Appellant] guilty . . . .

Appellant contends that, while standing at the door of EE's apartment, he realized what he was doing and that it was wrong, so he left, thus abandoning his plan to harm EE. Had the evidence supported this theory—Appellant abandoned his plan solely because of his own sense that it was wrong—then we would agree that the defense of voluntary abandonment would prevent a finding of guilt. But the evidence does not support this theory.

In Appellant's interview by AFOSI, he explained why he did not execute his plan when he said, "[T]hank God she wasn't home. . . . 'Cause otherwise I may have done it. . . . I might have actually harmed her in some way. I don't think I actually would have . . . killed her, but I'm sure I might have tried actually harm[ing her]." This admission, combined with Appellant's actions of knocking twice and waiting for 20 minutes and his recollection that he first threw his bag in a dumpster but then retrieved it and took it back to his dormitory room, convinces us beyond a reasonable doubt that he did not execute his plan simply because he was unable to—not because he realized that what he was doing was wrong. A reasonable factfinder could have made the same determination and found beyond a reasonable doubt that Appellant did not completely and voluntarily abandon his plan to kill EE.

In summary, we find the Government carried its burden to prove that Appellant specifically intended to kill EE and that he took a substantial step towards accomplishing that objective and thus attempted to commit premeditated murder. We also find Appellant did not completely and voluntarily abandon his criminal plan. A reasonable factfinder could have found beyond a reasonable doubt all the essential elements of the offense with which Appellant was charged and convicted, and we are convinced beyond a reasonable doubt of his guilt. Therefore, his conviction is legally and factually sufficient.

## D. Lack of Mental Responsibility

In Appellant's final assignment of error, he claims that, because of his diagnosed schizophrenia, he lacked the mental responsibility at the time of the offense to commit the offense and therefore his conviction was legally and factually insufficient. We are not persuaded.

### 1. Additional Background

Appellant was first diagnosed with schizophrenia when he was medically evacuated to Landstuhl in September 2015. In October 2015, Maj ER confirmed the diagnosis, and the disability evaluation process began. In April 2016, an IPEB found Appellant unfit for military service and recommended his discharge with no compensable disability. In June 2016, an FPEB overrode the IPEB and recommended "Permanent Retirement" with a disability rating of 100 percent.

When AFOSI interviewed Appellant on 8 June 2016, he had been an in-patient at the TAMC Behavioral Health Unit since 1 June 2016 and would remain there until 21 June 2016. After checking with the unit's attending psychiatrist, the AFOSI agents met Appellant, advised him of his Article 31, UCMJ, rights, which he waived, and then conducted the interview, which was videotaped and played at trial.

During the interview, Appellant made several references to his mental state during the events of 28–29 May 2016, beginning with the following:

> I wasn't in my right mind. Like my brain like clicked, to like where it switched. . . . [I have] schizophrenia, so I hear voices and like see things. So with that like I've had a series of like strange events to where I actually like lose time and things like that, to where I don't know what I did. And this is kind of like one of those times to where I still knew what I was doing somewhat, but my brain, like I could not stop myself from doing things. So that's kind of what happened, almost like a psychotic break in a way, to where like I didn't understand it. That's why I immediately went over here, sought treatment, 'cause I was like I don't know what's going on.

Appellant went on to describe his actions of the weekend in significant detail. Although his memory was not completely accurate and he misremembered the three-day gap between when he went to EE's apartment and when he talked with the chaplain, he did not appear to suffer memory loss for any significant action or period of time during the weekend of 28–29 May 2016.

After the Government rested its case during the findings portion of Appellant's trial, the military judge and counsel discussed the possibility of a defense of lack of mental responsibility and expert opinion testimony by Maj ER, which the judge decided to allow. When the court-martial resumed the next day, the military judge denied the Defense's motions for findings of not guilty and then asked whether the Defense was "going to offer the defense of [lack of] mental responsibility." The civilian defense counsel responded, "The defense intends to rest when we go back on the record," and the Defense in fact rested without presenting any evidence on any matter, including lack of mental responsibility.

For findings, the military judge instructed the court-martial panel members that the "evidence in this case raises the issue of whether [Appellant] lacked criminal responsibility for the [charged offenses and lesser included offenses] as a result of a severe mental disease or defect." The military judge continued with a lengthy instruction that informed the members if, when, and how to consider the defense. The instruction also covered the presump-

tion of mental responsibility, the defense burden "of proving by clear and convincing evidence that [Appellant] was not mentally responsible," and the procedure to decide the issue. The military judge then said:

> To summarize, you must first determine whether [Appellant], at the time of these offenses, suffered from a severe mental disease or defect. If you are convinced by clear and convincing evidence that [Appellant] did suffer from a severe mental disease or defect, then you must further consider whether he was unable to appreciate the nature and quality or the wrongfulness of his conduct. If you are convinced by clear and convincing evidence that [Appellant] suffered from a severe mental disease or defect, and you are also convinced by clear and convincing evidence that he was unable to appreciate the nature and quality or wrongfulness of his conduct, then you must find [Appellant] not guilty only by reason of lack of mental responsibility.

During closing argument for findings, the Government addressed mental responsibility by pointing out that the Defense presented "zero evidence" that Appellant lacked mental responsibility at the time of the offense. The Defense countered that "the documents that are important, that show a lack of mental responsibility are Prosecution Exhibits 23 and 24." Those exhibits were the respective forms documenting the results of the IPEB and FPEB, or, as the Defense explained them, "one that shows that [Appellant is] 100% disabled for schizophrenia, and the specific diagnosis is other specified schizophrenia disorder with auditory hallucinations." The Defense went on to argue that Appellant could not appreciate the wrongfulness of his actions because of his serious mental disease or defect of schizophrenia.

### 2. Law

The standard of review of legal and factual sufficiency is as stated above. "It is an affirmative defense in a trial by court-martial that, at the time of the commission of the acts constituting the offense, the accused, as a result of a severe mental disease or defect, was unable to appreciate the nature and quality or the wrongfulness of the acts." Article 50a(a), UCMJ. 10 U.S.C. § 850a(a); *see also* R.C.M. 916(k). "The accused has the burden of proving the defense of lack of mental responsibility by clear and convincing evidence." Article 50a(b), UCMJ, 10 U.S.C. § 850a(b); R.C.M. 916(b)(2).

> The affirmative defense of lack of mental responsibility requires the accused to prove, by clear and convincing evidence, that at the time of the offense, (1) the accused suffered from a "severe mental disease or defect," and (2) as a result of that mental disease or defect, the accused was "unable to appreci-

ate" either (a) the "nature and quality" of his acts, or (b) the "wrongfulness" of his acts.

*United States v. Mott*, 72 M.J. 319, 323 (C.A.A.F. 2013) (quoting Article 50a, UCMJ, 10 U.S.C. § 850a (2006)). Wrongfulness is determined using an "objective standard." *Id*. at 326.

In *United States v. Martin*, the United States Court of Appeals for the Armed Forces (CAAF) decided to test for "reasonableness" non-guilt findings of fact made by members on the question of mental responsibility but to test for "clear error" such findings if made by a military judge. 56 M.J. 97, 107 (C.A.A.F. 2001). Testing for reasonableness, an appellate court should reject non-guilt findings of fact made by members on the question of mental responsibility "only if no reasonable trier of fact could have failed to find that the [accused's lack of mental responsibility] at the time of the offense was established by clear and convincing evidence." *Id*. (citations omitted).

### 3. Analysis

As the Defense simultaneously acknowledged and argued at trial, the only evidence to prove Appellant's lack of mental responsibility was the evidence from the IPEB and FPEB. The document from the IPEB showed that Appellant had a diagnosis of "Schizophrenia Spectrum, Persistent Auditory Hallucinations," which many of the trial participants shortened to "schizophrenia." The document from the FPEB indicated that, because of Appellant's diagnosis, he was recommended for "Permanent Retirement" with a disability rating of 100 percent.

Assuming *arguendo* that it is appropriate to shorten the diagnosis of "Schizophrenia Spectrum, Persistent Auditory Hallucinations" to a diagnosis of "schizophrenia" and that schizophrenia is a severe mental disease or defect, we turn to the question of whether, as a result of schizophrenia, Appellant was unable to appreciate the nature and quality or the wrongfulness of the acts constituting the offense of attempted premeditated murder. Appellant's own statements, especially those made to AFOSI, indicate that he could. Appellant bought, collected, and put in a bag the items he believed he needed to "commit the perfect murder." He claimed he evaded the security cameras as he approached EE's apartment. He was prepared to destroy not only any evidence he left at the scene of the crime but also the crime scene itself in order to avoid getting caught. These statements lead us to conclude that, even if Appellant was not fully in control of all his mental faculties at the time of the offense, he was never unable to appreciate the nature and quality or the wrongfulness of his actions. Thus, we determine that a reasonable panel could have found that Appellant failed to carry his burden to prove by clear and convincing evidence that he was not mentally responsible at the

time of the offense. In other words, the defense of lack of mental responsibility fails the test for reasonableness and was not proven. *See Martin*, 56 M.J. at 107. Appellant's conviction of attempted premeditated murder remains legally and factually sufficient.

## E. Retirement Instruction

We specified the following issue: whether the military judge committed plain error by failing to instruct *sua sponte* on the impact of a punitive discharge on permanent retirement for physical disability. Despite the thorough brief submitted by Appellee, we find plain error and set aside the sentence.

### 1. Additional Background

The documentation of the IPEB and FPEB findings and recommendations was offered by the Government and admitted during the findings portion of Appellant's court-martial as Prosecution Exhibits 23 and 24 respectively.

During the presentencing proceeding, the Defense called Colonel (Col) DB, a psychiatrist and the Director of the Center for Forensic Behavioral Sciences, Walter Reed National Military Medical Center, Washington, District of Columbia. Col DB testified that "a finding of 100% disability. . . . What that would afford [a person severely disabled by an illness], in addition to disability payments is, lifelong access to medical care and treatment through the [Veterans Affairs (VA)] system . . . ." As Prosecution Exhibits 23 and 24 indicated and Col DB explained, Appellant's 100 percent disability rating acknowledged that Appellant's mental health condition would require long-term treatment and "likely interfere with [his] ability to lead a productive life in any occupation." In Appellant's written and verbal unsworn statements, he expressed his hope that he could continue to receive medications through the VA, which he could not if he was punitively discharged. The Defense did not present evidence on the impact of a punitive discharge on permanent disability retirement, which is what the FPEB recommended.

When the military judge and counsel discussed sentencing instructions, the Defense did not request and the military judge did not ask about an instruction on the impact of a punitive discharge on permanent retirement for physical disability. The Government did request an instruction on collateral consequences, which the military judge modified. After a defense objection and discussion on the record, the military judge further modified the instruction and decided to give it.

The military judge instructed the members on, *inter alia*, the effects of a punitive discharge, including that "[s]uch a discharge deprives one of substantially all benefits administered by the Department of Veterans Affairs and the Air Force establishment." The military judge later instructed, "The consequences that flow from a federal conviction, other than the punishment,

if any you impose, are collateral consequences of the conviction. The collateral consequences stemming from a federal conviction should not be part of your deliberations in arriving at a sentence."

The Government argued for a sentence that included ten years of confinement and a dishonorable discharge. The Defense argued that ten years of confinement and a dishonorable or bad-conduct discharge were not appropriate and noted that a punitive discharge "strips [Appellant] of all his benefits. It strips him of all his Veteran[s] Affair[s] benefits."

Although there had been discussion of the FPEB's recommendation for permanent disability retirement during the findings portion of trial, there was no mention of Appellant's eligibility for retirement during the presentencing proceeding when the members were present.

### 2. Law

In *United States v. Boyd*, the CAAF articulated the general proposition that, "[w]hen an accused is eligible for retirement, 'the potential loss of retirement benefits [is] a proper matter for consideration by factfinders[.]'" 55 M.J. 217, 220 (C.A.A.F. 2001) (second and third alterations in original) (quoting *United States v. Sumrall*, 45 M.J. 207, 209 (C.A.A.F. 1996)) (additional citation omitted). The CAAF then considered retirement for length of service and temporary disability retirement. *Id.* at 220–22. Regarding the former, the Defense requested an instruction, which request the military judge denied. The CAAF concluded that "any failure to instruct the members about the impact of a dismissal on future retirement benefits did not have a substantial influence on the sentence." *Id.* at 221.

Regarding Boyd's temporary disability retirement, the Defense did not request an instruction. The CAAF determined that "[b]ecause the defense did not request an instruction on the impact of a punitive discharge on temporary disability retirement, we will grant relief only if the military judge's failure to instruct *sua sponte* was plain error. *See United States v. Grier*, 53 M.J. 30, 34 (C.A.A.F. 2000) . . . ." *Id.* at 222. In *Boyd*, "there was no factual predicate for an instruction on temporary disability retirement," as no evidence about the appellant's eligibility for disability retirement was presented to the members. *Id.* The CAAF held therefore "that there was no error at all, much less plain error." *Id.*

As cited by the CAAF in *Boyd* (and the Government in its brief on the issue we specified), *Grier* holds, "To be plain error: (1) there must be an error; (2) the error must be plain (clear or obvious); and (3) the error must affect the substantial rights of the defendant." 53 M.J. at 34 (citing *United States v. Powell*, 49 M.J. 460, 463 (C.A.A.F. 1998)).

### 3. Analysis

As Appellee repeatedly points out, the Defense did not request an instruction on the impact of a punitive discharge on permanent disability retirement. Therefore, we will grant relief only if the military judge's failure to instruct *sua sponte* was plain error.

First, we find there was error. Contrary to Appellee's assertion, there was an evidentiary predicate that established Appellant's eligibility for permanent disability retirement: the FPEB findings and recommendation presented to the members in the form of Prosecution Exhibit 24. *See Boyd*, 55 M.J. at 222 (holding that there was no error where there was no "factual predicate," or any evidence presented to the members reflecting the appellant's eligibility for disability retirement). Despite this evidence before the members, the military judge did not ask the Defense about or *sua sponte* give a retirement instruction, and the members were not instructed on whether or how to consider the impact of a punitive discharge on permanent disability retirement.

Second, we find the error was clear or obvious. Prosecution Exhibits 23 and 24 were both discussed during the findings portion of trial, particularly when the Defense first objected to Prosecution Exhibit 23 but then withdrew the objection after the Government offered Prosecution Exhibit 24. In addition, the Government argued during findings that Appellant was concerned about his retirement pay and 100 percent disability compensation when he communicated the threat to kill any doctor who changed his diagnosis.[8] As the assistant trial counsel put it, "There is a reason he made that threat. He needed to make sure that that diagnosis did not change and . . . that his medical retirement would go through." Furthermore, Prosecution Exhibit 24, Appellant's documented diagnosis, and the FPEB's recommendation for retirement and disability compensation were all discussed before and while Col DB testified as a defense sentencing witness. Outside of the presence of the panel but on the record, the military judge himself described Prosecution Exhibit 24 as "the official retirement . . . . this is the Air Force, on [Appellant's] permanent record, saying, you know, you are hereby retired and this is based upon this diagnosis." The military judge then asked the trial counsel "Is that not correct?" and "But the Air Force is prepared to retire [Appellant] with a diagnosis of schizophrenia, correct?" The trial counsel responded "yes."

Third, we find the error of the military judge's failure to instruct on retirement affected the substantial rights of Appellant, specifically, his right to have the court-martial panel members consider all of the information they

---

[8] As noted previously, Appellant was found not guilty of this charge.

were allowed to consider before they adjudged his sentence. Underlying our assessment of the effect of the error is the premise articulated by CAAF that retirement pay "is a critical matter of which the members should be informed in certain cases before they decide to impose a punitive discharge." *United States v. Luster*, 55 M.J. 67, 71 (C.A.A.F. 2001) (citation omitted). Unlike in a case where an accused may become eligible for retirement based on years of service at a future date, *see, e.g., Boyd*, 55 M.J. at 220–21, Appellant was going to be permanently retired with a 100 percent disability rating once the FPEB issued its findings and recommendation. It was a matter of when, not if. In addition, the 100 percent disability rating meant lifetime care and treatment for the mental health condition that was not only the sole driver of Appellant's retirement but also a central matter in Appellant's trial.

Our consideration of the effect of the error in Appellant's case is further informed by the context in which it occurred. While the military judge gave the standard instruction on the effects of a punitive discharge, including the deprivation "of substantially all benefits administered by the Department of Veterans Affairs and the Air Force," the CAAF has determined that "[w]here a servicemember is perilously close to retirement . . . a general collateral-consequences instruction disregarding the effects of a punitive discharge on retirement will not suffice." *United States v. Talkington*, 73 M.J. 212, 217 (C.A.A.F. 2014) (quoting *United States v. Greaves*, 46 M.J. 133, 139 (C.A.A.F. 1997)). Furthermore, it is significant that the military judge gave—at the Government's request and over the Defense's objection—a collateral consequences instruction that in effect directed the members not to consider the impact on Appellant's permanent disability retirement when deciding his sentence. As the CAAF described in *Talkington*, "[t]he general rule concerning collateral consequences is that 'courts-martial [are] to concern themselves with the appropriateness of a particular sentence for an accused and his offense, without regard to the collateral administrative effects of the penalty under consideration,'" even if the collateral consequences may be referenced in an accused's unsworn statement. 73 M.J. at 215–16 (second alteration in original) (quoting *United States v. Griffin*, 25 M.J. 423, 424 (C.M.A. 1988)). But retirement is different:

> [I]n reality, the impact of an adjudged punishment on the benefits due an accused who is eligible to retire is often the single-most important sentencing matter to that accused and the sentencing authority. Thus, it is only in a theoretical sense that the effect a punitive discharge has on retirement benefits can be labeled collateral. Moreover, the impact on benefits -- whatever it may be -- can only be a direct and proximate consequence of the sentence.

*Griffin*, 25 M.J. at 424.

Lastly, we reject Appellee's contention that Appellant was not prejudiced because "his crime was such that a punitive discharge was a foregone conclusion." While we appreciate the gravity of Appellant's convicted offense of attempted premeditated murder, we also weigh Appellant's particular circumstances as a young man who will be released from confinement before he turns 30, who faces a lifetime of uncertain educational and employment opportunities, and who must deal with a mental health condition that was permanently aggravated by military service and that, if left untreated, could make him a danger to himself and others. The court-martial process provides for sentencing by members or a military judge at the election of the accused, includes a presentencing proceeding in which the Government, victim, and the accused all have the opportunity to be heard, and does not involve sentencing guidelines. Aside from mandatory-minimum punishments, there is no aspect of an adjudged sentence that is a foregone conclusion.

We therefore conclude that the military judge's failure to instruct *sua sponte* on the impact of a punitive discharge on Appellant's permanent retirement for physical disability was plain error. We set aside the sentence and authorize a sentence rehearing. *See Greaves*, 46 M.J. at 140.

**F. Timeliness of Appellate Review**

We review de novo whether an appellant has been denied the due process right to a speedy post-trial review and appeal. *United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citations omitted). A presumption of unreasonable delay arises when appellate review is not completed and a decision is not rendered within 18 months of the case being docketed. *Id.* at 142. When a case is not completed within 18 months, such a delay is presumptively unreasonable and triggers an analysis of the four factors laid out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citations omitted).

Appellant's case was originally docketed with the court on 22 August 2017. The delay in rendering this decision by 22 February 2019 is presumptively unreasonable. However, we determine no violation of Appellant's right to due process and a speedy post-trial review and appeal.

Analyzing the *Barker* factors, we find the length of the delay—seven weeks—is not excessively long. The reasons for the delay include the time required for Appellant to file his brief on 9 July 2018 and the Government to file its answer on 28 August 2018. The court then specified an issue for the parties to brief by 20 February 2019. Appellant has not asserted his right to speedy appellate review. With regard to possible prejudice, we recognize that

Appellant began his seven years of confinement on 25 April 2017. Because of our conclusion on the specified issue, we are setting aside the sentence and authorizing a sentence rehearing. Having also considered the potential effect of appellate delay on a rehearing, we still find no prejudice to Appellant resulting from the delay for the court to complete appellate review of his case.

Finding no *Barker* prejudice, we also find the delay is not so egregious that it adversely affects the public's perception of the fairness and integrity of the military justice system. As a result, there is no due process violation. *See United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). In addition, we determine that Appellant is not due relief even in the absence of a due process violation. *See United States v. Tardif*, 57 M.J. 219, 223–24 (C.A.A.F. 2002). Applying the factors articulated in *United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016), we find the delay in appellate review justified and relief for Appellant unwarranted.

## III. CONCLUSION

The findings are **AFFIRMED** and the sentence is **SET ASIDE**. A rehearing on the sentence is authorized. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c) (2016).

POSCH, Judge (concurring in the result in part and dissenting in part):

I agree with my esteemed colleagues in the majority on the resolution of Appellant's six assignments of error and the issue of timely appellate review and affirm the findings of guilty of attempted premeditated murder in violation of Article 80, Uniform Code of Military Justice, 10 U.S.C. § 880. However, I respectfully dissent with regard to the majority's conclusion that the military judge's failure to instruct on the effect of a punitive discharge on Appellant's apparent eligibility for permanent disability retirement materially prejudiced Appellant's substantial rights under Article 59(a), UCMJ, 10 U.S.C. § 859(a).

Ultimately, the court must determine whether any error of law had a "substantial influence on the sentence" adjudged by the court-martial. *See United States v. Boyd*, 55 M.J. 217, 221 (C.A.A.F. 2001) (concluding that "any failure to instruct the members about the impact of a dismissal on future [length of service] retirement benefits did not have a substantial influence on the sentence.") (citing *Kotteakos v. United States*, 328 U.S. 750, 765 (1946)). "If so, then the result is material prejudice to Appellant's substantial rights." *United States v. Griggs*, 61 M.J. 402, 410 (C.A.A.F. 2005) (setting out the test for the erroneous admission or exclusion of evidence). *See also United States*

*v. Sanders*, 67 M.J. 344, 346 (C.A.A.F. 2009); *United States v. Bridges*, 66 M.J. 246, 249 (C.A.A.F. 2008).

Assuming *arguendo* that the military judge's failure to *sua sponte* instruct on the impact of a punitive discharge on permanent disability retirement was error that was clear or obvious, I cannot conclude, after considering all the sentencing evidence and weighing Appellant's conviction against his sentence, that, if there was error, it was prejudicial.

Appellant never sought the retirement instruction that the majority today concludes the military judge was required to give. Nor did the Defense present evidence or argument[1] with regard to the effect that a punitive discharge would have on Appellant's eligibility for disability retirement pay that might result from the recommendation by the Formal Physical Evaluation Board (FPEB) that Appellant was medically unfit to serve,[2] distinct from disability pay and benefits administered by the Department of Veterans Affairs (VA).[3] It was the recognized loss of these latter benefits that was a significant focus of Appellant's sentencing case. The Defense argued that a dishonorable discharge would "strip[ ] [Appellant] of all his [VA] benefits" and that, considering "how expensive [Appellant's] medications are," a punitive discharge was not in Appellant's interest or society's. Nonetheless, the members considered Prosecution Exhibits 23 and 24, along with Col DB's testimony and Appellant's verbal and written unsworn statements,[4] and adjudged a punitive discharge, knowing full well that doing so would deprive Appellant "of substantially all benefits administered by the Department of Veterans Affairs and

---

[1] As the Defense may have deduced, the possibility that an appellant would receive retirement benefits can be a reason *for* adjudging a punitive discharge. *See*, *e.g.*, *United States v. Stargell*, 49 M.J. 92, 93 (C.A.A.F. 1998) (finding no error where the appellant was "knocking at retirement's door" and trial counsel argued the appellant "will get an honorable retirement unless you give him a [bad-conduct discharge].").

[2] The fitness determination is made by the Air Force. *See* 10 U.S.C. § 1201.

[3] Col DB testified that a finding of 100 percent disability would afford Appellant access to disability payments as well as medical treatment through the VA system.

[4] Appellant explained to the panel in his verbal unsworn statement *inter alia*:

> I will continue to try to get help no matter what the sentence is. I am worried though about my ability to continue to receive medication. I hope that I can continue to receive medications through the VA. I know that it will not be easy to determine what an appropriate sentence is. I ask for your leniency and mercy. I ask that you give me hope that I can continue to receive my medication once I leave jail.

the Air Force," as the military judge properly instructed the members that it would.

This was not a case "where the decision to award a punitive discharge was such a close call." *See United States v. Luster*, 55 M.J. 67, 72 (C.A.A.F. 2001) (finding prejudicial error in the exclusion of sentencing evidence of the appellant's expected retirement pay after he was convicted of a single specification of wrongful use of marijuana). This case stands in stark contrast to *Luster*, where the crime was relatively minor and the appellant "had no record of prior convictions or non-judicial punishments (although he was not a perfect airman)." *Id*. Here, Appellant was convicted of attempting a cruel and savage premeditated murder. If not for EE's decision to not open the door to her home, Appellant might have killed her with his eight-inch knife as Appellant intended and then covered up the crime, using his lighter, lighter fluid, trash bags, gloves, extra clothes, dust mask, and bottle of bleach.

Because the members were convinced that the more severe punitive discharge was appropriate and knew that a dishonorable discharge would sever Appellant's eligibility for medical treatment from the VA, I find it to be improbable on these facts that Appellant would have fared better and avoided a punitive discharge altogether if the military judge had instructed the members *sua sponte* on the possible loss of disability retirement pay as a result of the FPEB's recommendation.

The majority also finds error affecting Appellant's substantial rights, in part, because of a collateral consequences instruction given by the military judge.[5] The instruction that the majority finds concerning read, "the consequences that flow from a federal conviction, other than the punishment, if any you impose, are collateral consequences of the conviction. The collateral consequences stemming from a federal conviction should not be part of your deliberations in arriving at a sentence." The majority concludes that this instruction "in effect directed the members not to consider the impact on Appellant's permanent disability retirement when deciding his *sentence*." (Emphasis added.) I disagree. Had the instruction, in fact, charged that the collateral consequences of Appellant's *sentence* should not be part of the member's deliberations, I might be more aligned with the majority's conclusion. But it did not. I would be persuaded to agree with the majority's conclusion if the in-

---

[5] The Government asked for this instruction after Appellant's mother testified that Appellant might have difficulty "finding a job, because of a felony [conviction]." The military judge provided the instruction after concluding that her testimony alluded to a collateral consequence of Appellant's court-martial conviction.

struction directed the members to disregard the consequences of a sentence that included a punitive discharge (in conflict with the VA benefits instruction), but it did no such thing. Rather, the military judge properly informed the panel that the consequences that flowed from Appellant's federal *conviction*—other than, obviously, the punishment itself—were collateral and should not be a part of their deliberations. *See United States v. Talkington*, 73 M.J. 212, 216–17 (C.A.A.F. 2014) ("Collateral consequences" of a court-martial conviction are ordinarily not germane to determining an appropriate sentence because the collateral consequence "operates independently of the sentence adjudged."). This is in contrast to an "impact on benefits" as a "direct and proximate consequence of the *sentence*." *Id*. at 217 (emphasis added) (citing *United States v. Griffin*, 25 M.J. 423, 425 (C.M.A. 1988)).[6] I conclude the collateral consequences instruction in Appellant's case was both proper and benign.

I am not persuaded that the military judge's failure to instruct *sua sponte* on the impact of a punitive discharge on Appellant's permanent retirement for physical disability had a substantial influence on the sentence and thus materially prejudiced Appellant's substantial rights. The adjudged dishonorable discharge may not have been a foregone conclusion as Appellee argues, but it was not a close call either. *See Luster*, 55 M.J. at 72. I would not, therefore, set aside the sentence but would instead affirm the sentence as adjudged and approved by the convening authority.

FOR THE COURT

*Carol K. Joyce*

CAROL K. JOYCE
Clerk of the Court

---

[6] A collateral consequence may be the result of a conviction of a crime or the result of a particular sentence. A collateral consequences instruction may address either or both (i.e., a "general" collateral consequences instruction in the case of the latter). *Compare*, *e.g.*, *United States v. Talkington*, 73 M.J. 212, 216–17 (C.A.A.F. 2014) (addressing both conviction and sentence), *with*, *e.g.*, *United States v. Greaves*, 46 M.J. 133, 136–37 (C.A.A.F 1997) (addressing sentence only).